Bruce HUDSON, Plaintiff–Appellant,

v.

**WESTERN AIRLINES, INC.,
Defendant–Appellee.**

No. 87–6296.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1988.

Decided July 1, 1988.

Lee Boothby, Boothby, Ziprick and Yingst, Berrien Springs, Mich., for plaintiff-appellant.

Gilmore F. Diekmann, Jr., Bronson, Bronson and McKinnon, San Francisco, Cal., for defendant-appellee.

Before GOODWIN and HALL, Circuit Judges, and BELLONI,* District Judge.

---

\* The Honorable Robert C. Belloni, Senior United States District Judge, District of Oregon, sitting by designation.

GOODWIN, Circuit Judge:

Bruce Hudson appeals a judgment in favor of defendant Western Air Lines, Inc. ("Western") in this Title VII action for alleged religious discrimination. We have jurisdiction. We affirm.

Western was a full-service air line which operated on a 24 hour per day, seven day per week basis.[1] Each of Western's passenger flights was staffed by a crew of flight attendants ("attendants"). The number of attendants on a flight was set by the collective bargaining agreement between Western and the Association of Flight Attendants ("AFA"), which represented Western's attendants.

To assure that each of its flights was staffed by a full contingent of attendants, Western established for each attendant base a monthly set of individual attendant schedules. These schedules contained either blocks of flights which identified specific flights that an attendant would fly during the month and the days upon which the flights would be flown, or "reserve" lines which identified only duty days and days off during the month.

Reserve attendants covered flights that "blockholders" dropped or could not take. Reserves were divided into two groups. One group, the "call-in reserves," were required to call in at two specific times on each duty day. If they were not assigned a flight, they were released for a 12–hour period. The other group, the "ready reserves," were required to be available for assignment for the entire period of their duty day. If insufficient reserves were available and a flight left with less than the required number of attendants, Western would pay the remaining attendants short-staffing pay.

The monthly attendant schedules were developed jointly by Western and the AFA. Once the blocks and reserve lines had been set for each base, they were mailed to each attendant at the base in a "bid package."

---

1. Western was merged into Delta in 1987 and references are to the employment practices existing before the merger.

Attendants usually received these bid packages three weeks in advance of the month they covered. Each attendant filled out a "bid" for the blocks they preferred. Under the collective bargaining agreement, the blocks and reserve lines were awarded solely on the basis of seniority.

Generally, the most senior attendants bid for and received blockholder assignments and blocks of flights with weekends off. Call-in reserve lines were next in preference. Ready reserve lines were usually considered the least desirable, and were typically held by the most junior attendants at a base.

In terms of days off, the primary concern of most attendants was consistency of days off in any given month so that they could plan personal activities on a regular schedule. The second preference was generally for weekends off. Thus, blocks and reserve lines with all or most weekends off were generally considered most desirable and were generally taken by more senior attendants in each category.

Once awards were posted, the collective bargaining agreement provided several means by which attendants could adjust their flight schedule to accommodate personal desires and preferences including religious observance. Attendants could trade with another attendant the entire block or line they were awarded. Attendants could also trade specific trips with other attendants or trade days off if they were a reserve. Western facilitated the trading of blocks, flights and days off by posting the attendants' names and schedule awards in each flight attendant lounge, by providing bulletin boards and individual mail boxes for the transmission and receipt of messages, and by requiring attendants regularly to check their mail boxes for messages. Neither Western nor the AFA could veto or compel a trade.

Furthermore, blockholders could trade trips with a book of "open" flights by taking an open flight instead of a regular flight on their schedules, and then placing their scheduled flight in the "open book." This option was not available to reserves because reserves did not have scheduled flights to trade.

Finally, attendants who did not have sufficient seniority to attain the status and schedule they desired could also request a transfer to another base if they believed it would improve their seniority position. These requests were granted on a seniority basis as openings become available. Attendants could determine where their seniority would place them from posted seniority lists and schedules at various bases, and also by calling for such information to Western's general offices in Los Angeles.

The collective bargaining agreement also provided for attendants' vacation time, sick leave, emergency leave and personal leaves of absence.

Failure to report for scheduled flights usually resulted in "progressive discipline" whereby the flight attendant was given several warnings and a suspension before termination.

Hudson's initial training included instruction on bidding and trading procedures, transfer procedures, personal and emergency leaves of absence, and various other procedures available under the collective bargaining agreement to adjust her schedule and to determine her location. Hudson also was given a copy of the collective bargaining agreement, read it, and understood its provisions.

Hudson bid for and obtained an assignment to the attendant base in Los Angeles. Because of her low seniority, ready reserve status was the only status available. However, Hudson did not have to work weekends during the first six months of her employment.

While living in Los Angeles, Hudson became a member of a church that teaches its members not to engage in secular work between sunset Friday and sunset Saturday.

Hudson contacted her supervisor and her union representative about her need to observe her religious day of rest. The union representative reviewed with Hudson the options available under the contract for

adjusting her schedule to accommodate her personal needs.

For the next two years, Hudson was usually able to avoid working on her Sabbath. She bid on favorable schedules, bid for three consecutive month-long personal leaves when favorable schedules were hard to obtain, and on occasion called in sick or with fictitious emergencies. However, on a number of occasions between August and November 1980, Hudson worked during her Sabbath.

In June 1981, Hudson, at her own request, was transferred to Western's attendant base in Honolulu. Hudson believed that she would be better able to arrange her scheduling problems there. Also, the pay was higher there.

The transfer actually slightly decreased Hudson's chances of taking Sabbaths off. Had Hudson requested a transfer to Minneapolis instead of Honolulu, she could have received blockholder status. Had she stayed in Los Angeles, she might have received blockholder status in one month. Hudson had access to all of the seniority information regarding other attendant bases. Apparently, Hudson decided against a transfer to Minneapolis for financial reasons, although she knew that a transfer to Minneapolis would give her more scheduling options than would the transfer to Honolulu.

On June 8, 1981, after learning of her transfer, but before the actual transfer, Hudson drew a Saturday work assignment. She spoke to her supervisor, Harris, who allowed her to exchange a Thursday for a Saturday. Hudson interpreted this as a trade with the open book, even though such an option was not available to reserve attendants.

Hudson received her bid package for July in Honolulu which contained one ready reserve block with every Friday and Saturday off, and several other ready reserve blocks with most Fridays and Saturdays off. Hudson had enough seniority to obtain these blocks. However, she bid for, and obtained a call-in reserve line with no Sabbaths off.

Hudson apparently believed she could trade with the open book, and attempted to do so through normal channels for her first conflict, which was for July 3 and 4. On July 2, Hudson asked Los Angeles scheduling to find out whether or not the trade had been accepted. She was informed that her request had been denied. The manager of flight attendant scheduling informed Hudson that such an option was not available. At this point, Hudson tried unsuccessfully to find someone with whom to trade.

Hudson contacted Scott, the base flight attendant manager, concerning her conflict. Again, she explained her understanding that she could trade with the open book. Scott was unaware of such a policy. Because it was too late in the day to contact Los Angeles, Scott informed Hudson that she should take an emergency leave. Hudson did so.

Scott subsequently informed Hudson that she could not trade with the open book, and that her only options were those available through the collective bargaining agreement. During the following week, Hudson spoke with a union representative, with Western's manager of flight attendants scheduling, and with Western's EEO office in Los Angeles. They all informed her that her only options were those available under the collective bargaining agreement.

On July 9, Hudson called in and was informed that she had been assigned a flight which would require her to work on Sabbath. Hudson spoke to her shift supervisor, Wiles. She informed Wiles of her religious beliefs and stated that she would not accept the flight. Wiles informed Hudson that refusal would constitute an act of insubordination and could result in her termination. Hudson would not change her mind.

The next morning, Hudson met with her supervisor, Shak. After discussing what had transpired the night before, Hudson again confirmed that she had not accepted the flight. Shak then informed Hudson that her refusal constituted an act of insubordination. Hudson discussed briefly being

able to trade and offered to take an emergency leave as had been done the previous week. Western had enough time to replace Hudson. Thus, no crisis was involved, and the flight did not go out short-staffed. Nonetheless, Shak terminated Hudson.

After her termination, AFA filed two grievances against Western—one for termination and the other for the refusal to allow Hudson to trade with the open book. Prior to the hearing, Hudson met with Western and the AFA to discuss a possible resolution. Hudson suggested that she be able to trade days off within her schedule or use vacation and sick leave to avoid flying on her Sabbath. Western and AFA rejected these proposals as violating the collective bargaining agreement.

An arbitration was held. The arbitrator ruled in favor of Western. He concluded that the options proposed by Hudson were outside the collective bargaining agreement and would violate the agreement's seniority provisions.

Hudson also filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH"). She also brought a claim for unemployment compensation with the California Employment Development Department. Both the EEOC and the DFEH ruled against Hudson on the merits, and the California Employment Development Department rejected Hudson's claim.

Hudson now claims that rather than terminating her, Western should have: 1) offered her an emergency leave of absence; 2) offered her a personal leave of absence; 3) offered her a transfer to another domicile; 4) offered her a transfer to a non-flight attendant position; 5) offered to allow her to use vacation time; 6) modified the method of assigning reserve attendants; or 7) administered a less drastic punishment than termination.

## REASONABLE ACCOMMODATION

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 ("Title VII") requires an employer to make reasonable accommodations to their employees' religious beliefs, unless such accommodations to an employee's religious observance or practice would cause undue hardship. 42 U.S.C. § 2000e(j) (1982). Title VII rides a fine line between the desire to eradicate religious discrimination, and the Establishment Clause's preclusion against the favoring of religious beliefs over other nonreligious beliefs. It succeeds insofar as it does not result in undue hardship to the employer or adversely impact the employer's other employees. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81, 85, 97 S.Ct. 2264, 2275, 2277, 53 L.Ed.2d 113 (1977). *See also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 708–11, 105 S.Ct. 2914, 2917–19, 86 L.Ed.2d 557 (1985) (striking down, on Establishment Clause grounds, a law which required employers to give employees the day off on their Sabbaths regardless of hardship to employer).

Hudson challenges the district court's finding that the neutral, nondiscriminatory collective bargaining agreement provided reasonable accommodations for employees' religious beliefs. First, Hudson argues that such an agreement does not in itself provide a reasonable accommodation of religious beliefs. Second, Hudson argues that in this case, the collective bargaining agreement did not provide a reasonable accommodation of Hudson's beliefs. Third, Hudson charges that the district court applied an improper time frame by focusing on the agreement in general, rather than focusing on Hudson's request for accommodation in July 1981 when she refused the Sabbath flight assigned to her.

Hudson challenges the district court's finding that "a nondiscriminatory collective bargaining agreement which contains a nondiscriminatory seniority system provides a reasonable accommodation of religious beliefs." She claims that this conclusion of law implies that such an agreement inherently established a reasonable accommodation without regard to the facts of the case. Had the district court so held, Hudson might have had a good point. *See Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1086–89 (6th Cir.1987) (holding that a collective bargaining agreement's provision

permitting religious observers to trade days off with other employees did not, in the case of an employee who had a religious objection to seeking such a trade, provide that employee with a reasonable accommodation), *cert. denied,* —— U.S. ——, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988). However, Hudson ignores several related findings by the district court:

> In this case, both Western and AFA have shown that when Hudson explained the problems posed by her Sabbath-day observances to them, they directed Hudson to the provisions of the collective bargaining agreement and pointed out her options under it. The collective bargaining agreement, which was predicated upon a non-discriminatory seniority system, provided a means by which Hudson could bid upon work schedules, work domiciles, vacation time, and personal leave. The agreement also allowed Hudson to modify her schedule by trading her entire schedule or specific days off with other employees.

> .   .   .   .   .

> The various options available under the collective bargaining agreement between Western and AFA provided a means through which Hudson could have eliminated her religious conflict while preserving her employment status.

The record demonstrates that rather than focusing on the collective bargaining agreement in the abstract, the court discussed the agreement as it applied to Hudson's case, and discussed the conduct of Western and Hudson under the agreement. The court correctly applied the law to the facts.

■ Under Title VII, "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986). Once the employer has provided a reasonable system for accommodating employees' religious beliefs, it "need not further show that each of the employ-

ee's alternative accommodations would result in undue hardship." *Id.*

■ As noted, the trial court found that the collective bargaining agreement provided Hudson with reasonable accommodations to eliminate her religious conflicts and preserve her employment status. These conclusions are essentially factual determinations. *See Proctor v. Consolidated Freightways Corp.,* 795 F.2d 1472, 1476 (9th Cir.1986) ("[w]hether an employer has met its statutory burden to initiate a good faith effort to accommodate an employee's beliefs is a question of fact"). The findings are not clearly erroneous. Indeed, it appears that Hudson has not challenged the factual basis of these findings. Even if they were challenged, however, each of the bases for accommodation contained in the collective bargaining agreement are recognized as reasonable means of satisfying an employer's burden under Title VII. *See, e.g., Brener v. Diagnostic Center Hosp.,* 671 F.2d 141, 145–46 (5th Cir.1982) (employee scheduling system which permits trading of shifts provides reasonable accommodation);[2] 29 C.F.R. § 1605.2(d)(1)(ii) (1987) (flexible scheduling which allows employees to choose the days they work constitutes a good faith accommodation); 29 C.F.R. § 1605.2(d)(1)(iii) (1987) (allowing lateral transfers or changes of job assignments is a reasonable accommodation). All of these accommodations together constitute as significant a set of accommodations as can be found in the reported cases.

As the trial court found, the provisions in the collective bargaining agreement "provided the means through which Hudson could have eliminated her religious conflict while preserving her employment status." Under *Ansonia,* that is all that is required. *See Ansonia,* 107 S.Ct. at 373 (finding that the provision in that case "eliminates the conflict between employment requirements and religious practices"). There was no error.

■ Finally, Hudson's own failures to avail herself of reasonable means to elimi-

---

**2.** Hudson does not claim that she has any religious objection to swapping shifts. Thus, *Pyro*

*Mining,* 827 F.2d 1081, is inapposite.

nate the conflict between her religious beliefs and her employment demands undercut her claim that Western violated Title VII by refusing to accommodate her further in July 1981. *See American Postal Workers Union v. Postmaster General,* 781 F.2d 772, 776–77 (9th Cir.1986).

As the trial court found, Western provided reasonable means to eliminate her conflicts. Western and AFA both pointed out to Hudson her options under the collective bargaining agreement. Title VII does not allow Hudson to ignore these reasonable accommodations and then demand further accommodations when she subsequently developed a conflict.

> [W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.

*Ansonia,* 107 S.Ct. at 372.

Hudson also contends that Western imposed a harsher discipline upon Hudson than for those who refused assignment for secular reasons. Hudson, however, has not raised this claim below. This court will not review the claim for the first time on appeal. *United States v. Patrin,* 575 F.2d 708, 712–13 (9th Cir.1978).

### ATTORNEYS' FEES

■ Western asks for an award of the costs of the suit and attorneys' fees under 42 U.S.C. § 2000e–5(k) (1982). Prevailing Title VII defendants are entitled to an award of attorneys' fees only when the plaintiff's claims are frivolous, unreasonable, groundless or in bad faith. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). The trial court found that Western was not entitled to attorneys' fees under this standard.

Western did not cross-appeal this holding. Thus, Western cannot recover attorneys' fees for the pre-appeal hours. The failure to cross-appeal does not, however, preclude Western from recovering attorneys' fees for the appeal. *See id.* (allowing

attorneys' fees be awarded to Title VII defendants if "the plaintiff continued to litigate after [the claim] clearly became" frivolous, unreasonable, or groundless).

Nonetheless, we do not find that Hudson's continued litigation of this claim was frivolous, unreasonable, groundless or in bad faith. The fact that Hudson did not prevail is not enough. *See id.* at 421–22, 98 S.Ct. at 700–01.