779 F.Supp. 1016 (1991)
Jesse L. COOK, Plaintiff,
v.
CHRYSLER CORPORATION and United Automobile, Aerospace, Agricultural Implement Workers Local 110, Defendants.
No. 87-1985C(5).
United States District Court, E.D. Missouri, E.D.
December 31, 1991.
*1017 *1018 Walter E. Carson, Lee Boothby, Washington, D.C., Michael J. Hoare, St. Louis, Mo., for Jesse L. Cook.
R. Michael Lowenbaum, Charles M. Poplstein, St. Louis, Mo., for Chrysler Corp.
Morris Levin, St. Louis, Mo., for United Auto., Aerospace, Agr. Implement Workers Local 110.

MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiff filed this action alleging that defendants Chrysler and Local 110 UAW discriminated against him on the basis of his religion. Plaintiff alleges that Chrysler discharged him and the Local 110 UAW failed to properly represent him due to his religion in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e et seq. The case was tried before this Court sitting without a jury on September 14-15 and 18-19, 1989 and December 17-18, 1990. This Court, having now considered the pleadings, the testimony of the witnesses, the depositions testimony, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

FINDINGS OF FACT
Plaintiff Jesse Cook is a citizen of the United States who resides within the Eastern Division for the Eastern District of Missouri. Plaintiff Cook is an "employee" within the meaning of Title VII. Defendant Chrysler is a corporation duly organized and existing under the law and is an "employer" within the meaning of Title VII. The United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) and the Local 110 UAW are "labor organizations" within the meaning of Title VII.
At all times relevant to this cause of action, Chrysler owned and operated two motor vehicle assembly plants in Fenton, Missouri known as Plants 1 and 2. The UAW represents production and maintenance workers employed at both plants under a national collective bargaining agreement with Chrysler. This national collective bargaining agreement is supplemented by a local agreement at each of the plants. The national collective bargaining agreement was in effect during the time period relevant to plaintiff's cause of action. Local 110 UAW (Union) is a local labor union affiliated with the UAW and covered by the national collective bargaining agreement with Chrysler. It represents more than 3000 production and maintenance workers employed at Plant 2 and is a party to the local agreement with Chrysler covering those employed at Plant 2. The local agreement was in effect during the time period relevant to plaintiff's cause of action.
The national agreement sets forth a two-shift production schedule. Shift 1 operates Monday through Saturday from 8:00 AM to 4:00 PM. Shift 2 operates Monday through Saturday from 4:00 PM to midnight. There is generally no production work scheduled on Sunday; however if it is, such work is considered double-time work and is compensated at a higher hourly rate. The work schedule or shift times can not be changed by Chrysler without Union vote and approval.
The national agreement also sets forth a no-fault absenteeism policy, known as the Uniform Attendance Procedure. Under the Procedure, no discipline is mandated for the first six (6) absences in any six (6) month period (excused or unexcused) but additional unexcused absences result in progressive discipline in six (6) successive steps. For the first unexcused absence (after the first six non-sanctioned absences), *1019 the worker is counseled by both Chrysler management and the Union. The second is additional counseling, the third is a five (5) day disciplinary lay-off, the fourth is a fifteen (15) day disciplinary lay-off, the fifth is a thirty (30) day disciplinary lay-off, and the sixth results in permanent discharge from employment. Chronic absenteeism is also addressed by the national agreement. Any employee who is absent over 20% of the time over a six (6) month period (counting a five-day workweek) is counseled. If the absenteeism continues, the employee faces discharge.
In 1985, Plant 2's local agreement with Chrysler was amended to address a growing problem with absenteeism, especially on Friday nights. An "excused in advance" program was set up by which employees could sign up in a book for an excused day or night on a first come, first serve basis. Time off may be signed for no more than thirty (30) days in advance. The book fills up for Friday nights faster than any other time period.
Under the terms of the national agreement, if employees are on lay-off at Plant 1 and there are openings at Plant 2, they are offered the option to work at Plant 2 in accordance with their seniority until all slots are filled. If an employee is offered and refuses the transfer, s/he is not entitled to receive the unemployment benefits provided to laid-off workers under the national agreement. If an employee transfers, his/her seniority at the originating plant does not count, and the seniority date at the new plant is the date of transfer. The employee stays at the new plant until s/he is laid-off, at which time s/he has the option to return to the originating plant (if jobs are available) with the same seniority or stay laid-off.
Each plant negotiates separately for its own local agreement with Chrysler. Seniority is on a plant-by-plant basis. Employees at each plant are laid-off, recalled, and select shifts on the basis of their seniority at that particular plant and their seniority within each particular department in the plant. There is no interchange of seniority between the two plants. Seniority, at Plant 2, determines shift preference, vacation preference, job assignments, and other various personnel matters.
Seniority provisions, especially shift preference, is highly valued by workers. The right to assert shift preference is embedded in Plant 2's local agreement with Chrysler and can not be amended, modified, or removed without (re)negotiation, ratification, and approval by membership vote. The seniority provisions can not be changed or eliminated independently by UAW officers, Union officers, or Chrysler management. The seniority provisions, especially shift preference, is personal to each union member and is asserted and defended by virtue of both the national agreement and the local agreement.
The national agreement provides a procedure for the adjustment of grievances, including challenges to discipline assessed by Chrysler. The procedure begins at the supervisor level, then proceeds to the area manager level, and then to the plant manager level. If the grievance cannot be resolved at any of these levels, the matter proceeds to an appeal board, which consists of two Chrysler representatives and two UAW representatives. If the grievance cannot be resolved, the UAW has the option of proceeding to arbitrate the matter to a final decision. As a practical matter, the grievances are handled by Union representatives and Chrysler labor relations representatives.
Plaintiff Cook began his employment with Chrysler, at Plant 1, in January 1976. During periods of lay-off, plaintiff transferred back and forth between Plants 1 and 2. In 1983, plaintiff was recalled to Plant 1 on the second shift. He remained at Plant 1 on the second shift until an indefinite lay-off in November 1985. Plaintiff remained on indefinite lay-off until January 14, 1986, when he elected to transfer to Plant 2 on the second shift. January 14, 1986 became his seniority date at Plant 2.
At Plant 2, during the relevant time period, plaintiff held one of the less desirable jobs on the assembly line. His job was primarily to install the spare tire and jack in the trunk of the car. This job was one *1020 of approximately thirty (30) jobs on the assembly line. In order to keep things running smoothly, plaintiff's job (as well as the other jobs on the line) had to be completed within a designated timeframe. Plaintiff's job required a certain level of competency not easily replaced. Absenteeism on the line resulted in increased number of complaints and repairs.
In October 1985, shortly before his indefinite lay-off at Plant 1, plaintiff became a member of the Seventh Day Adventist Church. One of the tenets of the Church is that a member may not do manual labor or other types of secular labor from sundown Friday to sundown Saturday. While at Plant 1, after plaintiff became a Seventh Day Adventist and shortly before his indefinite lay-off, plaintiff was assessed Step 1 discipline under the Uniform Attendance Procedure due to unexcused absences on Friday nights. He transferred to Plant 2 before any additional disciplinary measures were taken for his unexcused Friday night absences.
On January 17, 1986, shortly after transferring to Plant 2, plaintiff delivered two letters to Edward Pope, Employment Supervisor at Plant 2. One letter was written to Mr. Pope advising him of plaintiff's religious beliefs and a request for accommodation; the other letter was from plaintiff's pastor, W.E. Dagenais. Pope made copies of the letters and told plaintiff to deliver his letters to plaintiff's supervisor, Robert Brinkley.
Plaintiff then delivered his letters to Brinkley, who advised plaintiff that he would get back to him about the accommodation request. Although it is unclear as to who was contacted next about plaintiff's request, it is agreed that Ken Davenport (Union Shop Steward), Thomas Kallaos (Labor Relations Supervisor), and Donald Woemmel (Union President) all were informed of plaintiff's situation.
In his letter of January 17, 1986, Cook acknowledges that the local agreement with Chrysler (for Plant 2) makes no provision for an accommodation for persons who "keep the Sabbath". He suggests possibilities whereby Chrysler might accommodate him. These include flexible scheduling, the use of compensatory time, making lateral transfers without loss of seniority, arrange shift trades and/or time swaps, and allow temporary accommodations while a permanent accommodation is being arranged.
After transferring to Plant 2 in January 1976, plaintiff was absent every Friday night and late for work every Saturday night. Pursuant to the Uniform Attendance Procedure, Cook was assessed Step 1 discipline after his sixth absence and then was issued a Step 2 discipline for his seventh absence. Thereafter, although Cook continued with his Sabbath absences for more than eight weeks, he was not disciplined. Cook was not told specifically why the absences were not being disciplined but he was told by Brinkley that Chrysler was looking into his accommodation request.
Meanwhile, Thomas Kallaos was investigating possible solutions to the problem. He determined that the only way to accommodate Cook without violating the local agreement was to see if Cook's seniority would allow a transfer to the first shift. Kallaos checked Cook's seniority and discovered that he did not have seniority to allow such a transfer. Kallaos then spoke with Reggie Crocker, Chrysler's Equal Employment Opportunity Supervisor in Detroit, Michigan. Crocker advised Kallaos that if Cook did not have seniority for a transfer to the first shift, then Kallaos could ask the Union for permission to place Cook on the first shift out of line with seniority. Crocker further advised Kallaos that if the Union refused permission for the transfer, then he had two options: 1) advise plaintiff that the Union refused permission to transfer plaintiff to the first shift out of line with seniority; or 2) transfer plaintiff to the first shift anyhow and let the Union grieve the action. Finally, Crocker advised Kallaos that if Cook was not transferred to the first shift, then Cook had to work Friday nights but that his tardiness could be accommodated on Saturday night. Absenteeism is not as much of a problem on Saturday night as it is on Friday night.
*1021 If Cook was off every Friday night with or without pay, Chrysler would still be required under the collective bargaining agreement to pay the cost of his benefits, which costs assume an employee works a full work week. The cost of the benefit package lost because of being absent 20% of the time (approximately one day per week) is $1578 per year. The plant costs allocated to each employee which are lost by an employee being absent one day every week exceed $5000 per year.
Temporary part-time employees (TPTs) are persons hired to cover casual absences; not regular permanent on-going absences. By contract, TPTs work only on Mondays and Fridays. If a TPT works more than 120 days, the National Agreement with Chrysler provides for additional benefits for that TPT. TPTs are generally trained on the job and do not fill in for a regular worker on a constant basis. Consequently, Chrysler can not guarantee the same TPT would fill in for plaintiff every Friday night.
"Floaters" are full-time employees who replace other workers absent due to vacations, advanced excused absences, or medical emergencies and/or leaves. They work the same shift schedules as regular line workers and are paid full benefits. If a floater were to replace someone, like plaintiff, on a constant regular basis, another floater would have to be hired in order to keep an adequate number of floaters available (for the other absences).
After speaking with Crocker, Kallaos then spoke with Don Woemmel. Kallaos asked permission to transfer Cook to the first shift out of line with seniority. Woemmel refused stating that such a transfer was in breach of the local agreement and would prejudice the rights of the other workers at Plant 2 with more seniority than Cook. He reminded Kallaos that a waiver of shift preference rights or modification of the local agreement could not be done unilaterally by either Chrysler or the Union without the affirmative vote and approval of the Union membership.
Kallaos then talked with Richard Burton, the Union's Regional Supervisor. Burton took the exact same stance as did Woemmel, for the same reasons.
On May 6, 1986 Robert Brinkley and John McFarland (Chrysler Plant Final Area Manager) met with plaintiff and gave him a written supervisor's report. This report informed plaintiff that he did not have seniority to transfer to the first shift, that further absences on Friday nights would be unexcused, and that these unexcused absences would be treated like any other unexcused absence under the Uniform Attendance Procedure. Another Seventh Day Adventist, Roger Williams, was given the same supervisor's report. Williams had been accommodated for a time being while at Plant 1. The same accommodation was short-lived at Plant 2. After the May 6th supervisor's report, Williams used the book procedure and leaves of absence to continue his employment. He eventually accrued enough seniority to transfer to the first shift.
Thereafter, Cook continued for the most part to accrue unexcused absences on Friday nights. He was progressively disciplined pursuant to the Uniform Attendance Procedure and the chronic absenteeism procedures. At each unexcused absence disciplinary step, the Union filed a grievance on behalf of Cook. On September 12, 1986 plaintiff absented himself and consequently on September 16, 1986 was issued Step 6 discipline and was discharged by Chrysler.
The Union then proceeded to file a discharge grievance with the Appeal Board of the UAW. The Union sought reinstatement of Cook and the use of a "floater" on the nights he was absent. The Union also sought a continuing excused absence for Cook's Sabbath hiatus. Chrysler rejected the Union's proposal. The Union did not take the matter to arbitration because on the face of it the discharge was proper under the Uniform Attendance Procedure and the chronic absenteeism procedures.
Plaintiff remained unemployed until March 1987 when he began work with Central States Services. Since his discharge through December 17, 1990, Cook earned $73,558.45 in wages and unemployment compensation. If Cook had remained employed *1022 at Chrysler through December 17, 1990, he would have earned $141,920.73.
On September 24, 1986 Cook filed an EEOC charge of religious discrimination against Chrysler. The EEOC issued a Right to Sue letter on July 30, 1987. Cook filed this action on October 27, 1987. He seeks reinstatement, back pay, seniority, lost benefits, and legal fees.

CONCLUSIONS OF LAW
Plaintiff Cook has brought suit alleging employment discrimination on the basis of religion. The Court has jurisdiction pursuant to § 706 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. Plaintiff has satisfied all the procedural prerequisites to suit under Title VII. The parties all agree that plaintiff has met the burden of establishing a prima facie case of religious discrimination in that 1) plaintiff has a bona fide religious belief that conflicts with an employment requirement; 2) plaintiff informed both Chrysler and the Union of this belief (i.e. working Friday nights violated the Seventh Day Adventist prohibition against secular work on the Sabbath); and 3) plaintiff was disciplined and eventually discharged for failure to comply with the conflicting employment requirement. Johnson v. Angelica Uniform Group, Inc., 762 F.2d 671, 673 (8th Cir.1985); Brown v. General Motors Corp., 601 F.2d 956, 959 (8th Cir.1979).
Title VII, as amended, makes it an unlawful employment practice for an employer to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a)(1). This section of Title VII must be read in conjunction with the section which defines religion to include all aspects of religious observance and practice, as well as beliefs, the employer must reasonably accommodate unless s/he can demonstrate undue hardship in so doing. 42 U.S.C. § 2000e(j). Title VII also makes it an unlawful employment practice for a labor organization to discriminate against any person because of religion or to cause or attempt to cause an employer to discriminate on the basis of religion. 42 U.S.C. § 2000e-2(c).
Once a plaintiff has made out a prima facie case of religious discrimination, the burden shifts to the employer to produce evidence showing that it can not reasonably accommodate the employee without incurring undue hardship. Protos v. Volkswagen of America, Inc., 797 F.2d 129, 134 (3rd Cir.1986). The employer's burden is one of "production rather than persuasion, and the plaintiff bears the ultimate burden of establishing by a preponderance of the evidence that defendant could have reasonably accommodated his religious beliefs and practices without undue hardship ...". Boomsma v. Greyhound Food Management, Inc., 639 F.Supp. 1448, 1452 (W.D.Mich.1986), appeal dismissed, 815 F.2d 76 (6th Cir.1987). Furthermore, once the employer has demonstrated that it has offered a reasonable accommodation to the employee, the statutory inquiry ends. Ansonia Board of Education v. Philbrook, 479 U.S. 60, 68-69, 107 S.Ct. 367, 371-72, 93 L.Ed.2d 305 (1986). The employer must produce evidence of undue hardship only if it professes an inability to offer any reasonable accommodation. "[T]he extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." Ansonia, at 69, 107 S.Ct. at 372.
Plaintiff contends that defendant Chrysler chose to ignore his situation instead of taking steps to reasonably accommodate him by transferring him to the first shift or excusing his Friday night absences and using TPTs or floaters to fill in for him. He further argues that the Union failed to protect his employment rights by refusing Chrysler permission to transfer plaintiff out of seniority and by failing to arbitrate his discharge grievance. The Court finds that Chrysler and the Union both met their Title VII obligations.
Both Chrysler and the Union testified uncontrovertably that the national agreement and the local agreement controlled the degree of flexibility each had in addressing plaintiff's situation. Thomas Kallaos, Donald Woemmel, and Melvin Jarvis *1023 (Alternate Shop Steward) all testified that there were no alternatives for Cook without violating the collective bargaining agreements. Transferring plaintiff to the first shift out of seniority clearly violated the seniority provisions of the local agreement. Excusing plaintiff every Friday night clearly violated the Uniform Attendance Procedure and the chronic absenteeism policy.
In Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the Supreme Court held that Title VII did not require an employer to undertake any activity to accommodate an employee which would violate a bona fide seniority system. Title VII's reasonable accommodation requires only that an employer make a good faith effort to accommodate the employee's religious beliefs. "It does not require that in doing so an employer override an established seniority system, nor does it require that an employer take steps that go beyond those a reasonable person would take." Krushinski v. Roadway Exp., Inc., 626 F.Supp. 472, 473-474 (M.D.Pa.1985). Title VII's mandate to employers to try to reasonably accommodate religious needs "does not supercede the contractual rights of other employees." Huston v. Local No. 93, International UAW, 559 F.2d 477, 480 (8th Cir. 1977). This same limitation is equally applicable to the unions. A union may be able to grant a variance if it met with approval of the membership, but "it certainly could not vary the seniority provisions of the collective bargaining agreement in disregard of the contractual rights of employees who wished to be afforded the benefits of their seniority." Huston, at 480.
There were only two options available to accommodate Cook without incurring undue hardship. Granting Cook a preference in the seniority structure would violate the local agreement; notwithstanding the fact it would create very hard feelings among Cook's fellow employees, especially those with more seniority who qualified but could not transfer due to lack of openings. Additionally, Chrysler officials testified that since no openings existed (during the time in question) on the first shift, someone would have to be bumped to make room for Cook. The Court can only imagine the degree of animosity and hostility such a move would create. Excusing Cook every Friday night would circumvent the "book procedure" specifically set up to afford everyone equal opportunity to arrange absences. Constant Friday night absences would also conflict with the chronic absenteeism policy. Circumventing the book procedure and the chronic absenteeism policy would violate the local agreement and supercede the contractual rights of Cook's fellow workers.
The other options that plaintiff feels should have been considered are equally violative of the collective bargaining agreements or would cause undue hardship to Chrysler. An employer is not obligated to take accommodation steps which would require it to incur additional costs, such as overtime pay for replacements, if such costs were more than de minimis. TWA v. Hardison, 432 U.S. at 84-85, 97 S.Ct. at 2277; Wren v. T.I.M.E.-D.C., Inc., 595 F.2d 441, 445 (8th Cir.1979) [citing in affirmance, Wren v. T.I.M.E.-D.C., Inc., 453 F.Supp. 582 (E.D.Mo.1978)].
Cook's absence on the assembly line every Friday night would involve additional costs to Chrysler, both in the form of lost efficiency and increased employee wages. Thomas Kallaos testified that there were no shifts or departments that plaintiff could transfer into (in line with his seniority) that would not require Friday or Saturday work. He testified that the local agreement did not provide for swapping shifts or trading seniority and neither Chrysler nor the Union could force employees to do so. Substituting Sunday work for plaintiff's Sabbath absences was not possible because no production was normally scheduled on Sunday. If production was scheduled on Sunday, the local agreement mandated double-time wages. He further testified that the collective bargaining agreements did not provide for a flexible work schedule within the shifts. Furthermore, since plaintiff's Sabbath absences would change seasonly (even perhaps *1024 weekly or monthly as times for sunset and sunrise change), it would be very difficult to schedule other employees to cover plaintiff's absences. Finally, the collective bargaining agreements did not provide for "temporary" assignments.
Using TPTs or floaters would create additional expense to Chrysler. Not only would Cook continue to receive his full benefits despite working a four-day week, but Chrysler would have to pay the TPT or floater wages and benefits. In order to keep the replacement pool number adequate (to cover other workers' absences) Chrysler would have to hire (and pay) someone to replace the person replacing Cook every Friday night. Lost efficiency was another price Chrysler would have to pay for Cook's absences. Jarvis and Ron Czar (Chrysler Quality Manager) testified to increased number of repairs during Cook's absences. Absenteeism directly affected the quality of workmanship. Absenteeism also directly affected morale among the workers on the line. Brinkly and Jarvis testified to increased number of complaints (when plaintiff was absent) regarding the number of repairs that had to be done on the job plaintiff normally performed and the slow performance of the replacement workers.
The testimony of Chrysler and the Union witnesses remained largely undisputed by plaintiff. Instead his main contention is that the defendants did not do enough to figure out a way to accommodate his religious needs. While it is true that defendants cannot excuse their failure to accommodate him by simply "sitting on their laurels" or pointing to the deficiencies in plaintiff's suggested alternatives, plaintiff cannot maintain a posture of uncooperativeness. Hudson v. Western Airlines, Inc., 851 F.2d 261, 266-67 (9th Cir.1988); Anderson v. General Dynamics, 589 F.2d 397, 401 (9th Cir.1978); Krushinski, at 474-75; Wren, 453 F.Supp. at 584. The trial record is very quiet as to steps taken by the plaintiff to eliminate the conflict between his religious beliefs and employment demands. Plaintiff used the book procedure a couple of times, but for the most part simply did not show up for work on Friday nights and arrived late for work on Saturday nights. He chose not to use the means available within the system, such as the book procedure, vacations, leaves, etc. to avoid discipline. Although the employer has an accommodation duty, the employee has a correlative duty to make a good faith attempt to satisfy (her) needs through means offered by the employer. Hudson, at 266-67; Krushinski, at 474; Wren, 453 F.Supp. at 584. "An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer." Chrysler Corp. v. Mann, 561 F.2d 1282, 1285 (8th Cir.1977). Plaintiff did little to fulfill his mutual obligation to cooperate. "A failure of cooperation by either party will clearly lessen the chances of achieving a reasonable accommodation." Chrysler Corp. v. Mann, at 1285.
The defendants, on the other hand, did all they were required to do under Title VII. Chrysler management did not overly exert itself in assisting plaintiff. However, it did make efforts within the seniority system to accommodate plaintiff. See, Wren, 453 F.Supp. at 584. Kallaos looked into plaintiff's seniority status. He conferred with representatives of the Church. He sought advice from Chrysler's EEO Supervisor and attempted to get permission from the Union to transfer plaintiff to Shift 1 out of seniority. He sought a way to assist Cook within the seniority system but couldn't find a way. The collective bargaining agreements were a maze of restrictions. Everywhere he turned he ran into a "violation" wall. Other options would require Chrysler to bear more than a de minimis cost in order to give plaintiff the Sabbath off.
The Union officials were equally stymied by the collective bargaining agreements. The Union had no duty to waive or modify the seniority provisions of the local agreement to the detriment of its members. Its refusal to do so neither constituted unlawful discrimination against plaintiff or *1025 caused such discrimination by Chrysler. See, Huston, at 481. The Union's only duty to plaintiff was to protect and defend his statutory and contractual employment rights. It carried out this duty in good faith by filing a grievance on behalf of plaintiff at every discipline step. It took his discharge grievance to the Appeals Board. After that it conceded that plaintiff was properly discharged pursuant to Step 6 of the Uniform Attendance Procedure. John Guinan (the UAW representative to the Appeals Board) testified that arbitration was pointless because the discharge was in conformity with the collective bargaining agreements and the Uniform Attendance Procedure. The Union had the right to determine the viability of plaintiff's grievance and cannot be faulted for concluding that his grievance was not a good candidate for arbitration. Failure to secure for plaintiff the relief he wanted does not evidence a breach of the Union's good faith duty to represent plaintiff's interests.
The defendants explored every avenue for the purpose of accommodating plaintiff but simply were unable to do so due to Cook's seniority (or lack thereof) and the collective bargaining agreements. Title VII did not compel them to trample upon everyone else's non-discriminatory contractual rights in order to accommodate plaintiff's religious beliefs. The defendants provided a seniority system, which in itself, represented a significant accommodation to the needs, religious and secular, of all employees. Hardison, 432 U.S. at 77-78, 97 S.Ct. at 2273. Title VII does not require an employer or union to discriminate against some employees in order to allow others to observe their Sabbath. Hardison, at 85, 97 S.Ct. at 2277. Title VII also does not require differential treatment which would confer a privilege, the cost of which was more than de minimis, solely on the basis of religious needs. Hardison, at 81-85, 97 S.Ct. at 2275-77; see also, Brown, at 962.
The collective bargaining agreements provided a seniority system designed to protect all employees' rights by insuring fair and equal treatment. It wasn't a perfect system and in plaintiff's case proved to be more of a hindrance than a help. However, given the particular circumstances of this case, the Court concludes that defendants Chrysler and the Union satisfied their "reasonable accommodation" obligation as required by Title VII.
For the foregoing reasons, the Court enters judgment in favor of the defendants Chrysler and the Union and against plaintiff Cook on the merits of plaintiff's complaint.