Angelo **RODRIGUEZ**, Plaintiff,

v.

The **CITY** of **CHICAGO**, a municipal corporation, defendant.

No. 95 C 5371.

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 11, 1997.

Kevin J. Todd, David Shaneyfelt, Bruce J. Van Heukelem, Hoogendorn, Talbot, Davids, Goddfrey & Milligan, Chicago, IL, for Plaintiff.

Nancy L. Van Allen, Eileen B. Libby, City of Chicago, Law Dept., Corp. Counsel, Chicago, IL, Jay Michael Kertez, City of Chicago, Law Dept., Chicago, IL, Susan S. Sher, Corp. Counsel, City of Chicago, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff Angelo Rodriguez ("Rodriguez") filed this action against Defendant City of Chicago, Department of Police (the "City") for religious discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended, and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb–1(c) *et seq.* Both parties now move for summary judgment. For the reasons set forth below, the Court denies Rodriguez's motion for summary judgment and grants the City's motion for summary judgment.

### BACKGROUND

Unless otherwise noted, the following facts are undisputed. Since September 1980, Rodriguez has served as a patrol officer in the Chicago Police Department's 14th District. Located within the 14th District are two clinics at which abortions are performed: (1) the Central Medico Pan American Clinic, located at 3412 W. Fullerton Ave. ("the Fullerton Clinic"), and (2) the American Women's Medical Center, located at 2744 N. Western Ave. ("the Western Clinic").

Following a demonstration at the Fullerton Clinic on October 23, 1993, the Police Department began to assign one or more officers to abortion clinics throughout the City to protect the clinics' property and to assure the safety of the clinics' employees. According to the City, the purpose of the assignments is to keep the peace between demonstrators. Rodriguez was one of the officers assigned to maintain a presence outside the Fullerton Clinic.

On the first day of his new assignment, Rodriguez reported to the Fullerton Clinic and performed his duties. Roughly two or three weeks later, when he was again assigned to the Fullerton Clinic detail, Rodriguez similarly reported and fulfilled his monitoring obligations. Rodriguez testified that following his second assignment to the Fullerton Clinic, however, he became convinced that his presence at the clinic facilitated the ongoing activities of the abortion clinic and, consequently, conflicted with his Roman Catholic beliefs.

On January 29, 1994, Rodriguez informed his watch commander, Captain William Guswiler ("Guswiler"), of his religious opposition to serving on the Fullerton Clinic detail. Rodriguez told Guswiler that he did not have any problem going to the clinic in an emergency situation, but other than that he did not want to be assigned to abortion clinics. Guswiler told Rodriguez that he would try not to assign him to abortion clinics, but that he (Guswiler) could not give Rodriguez any guarantee or formal "exemption" from such work. Rodriguez agreed to be available at the clinics in the event of any emergency. For four months thereafter, Rodriguez was not assigned to the Fullerton Clinic watch.

On April 25, 1994, Rodriguez tore his left Achilles tendon and was placed on medical leave. Upon returning to work in September 1994, Rodriguez sought to assure that he would not again be assigned to active duty at either the Fullerton Clinic or the Western Clinic. To this end, Rodriguez sent a memorandum dated October 7, 1994 to 14th District Commander Jose Velez ("Velez") in which Rodriguez stated that his "religious belief that human life begins at conception and that abortion is the intentional killing of a human being prohibits my participation in keeping abortion clinics open." The memorandum requested that Rodriguez be exempted from future assignments at abortion

clinics because of these religious beliefs.[1]

Upon receipt of the memorandum, Guswiler spoke with Velez and they agreed that Rodriguez was not free to refuse an assignment. The City maintains that Guswiler and Velez further agreed that, depending on operational needs, Guswiler would, when possible, avoid assigning Rodriguez to clinic duty. In any event, Rodriguez never received a written response to his memorandum from Velez or anyone else at the City.

Subsequently, on November 19, 1994, Police Officer Tietz, who was assigned to one of the abortion clinics in the 14th District, requested a replacement to take a "personal." [2] Rodriguez was assigned to replace Officer Tietz, and directed to report to the abortion clinic detail. Rodriguez then requested a personal and went to speak to his supervisor, Sergeant Ronald Grimes ("Grimes"), in the 14th District station. Rodriguez informed Grimes that he objected to the abortion clinic assignments, but Grimes responded that Rodriguez could not refuse the assignment.[3] Under protest Rodriguez agreed to, and did report to the Western Clinic for approximately one-half hour until the assignment was canceled. Rodriguez asserts, and the City denies, that the situation ultimately forced Rodriguez to choose between his job and his religious beliefs. Rodriguez has not been assigned to any further abortion clinic details since November 1994.

Rodriguez brought this suit against the City alleging that the City violated his rights under Title VII, RFRA, and the Municipal Code of the City of Chicago ("Municipal Code"). On January 12, 1996, the Court granted the City's motion to dismiss the claim under the Municipal Code, and denied its motions to dismiss the claims under Title VII and RFRA. Pursuant to the recent United States Supreme Court decision in *Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which held RFRA unconstitutional, both parties have agreed to the dismissal of the RFRA claim, leaving only the Title VII claim.

## DISCUSSION

### I. *Standards for Summary Judgment*

Summary judgment is appropriate where the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any material fact" and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are those that might affect the outcome of the suit under governing law. *Id.* A "genuine issue" exists if there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. at 2510. When considering a motion for summary judgment, the Court must view the facts, and all inferences drawn from the facts, in the light most favorable to the nonmovant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. U.S. Postal Serv.,* 821 F.2d 382, 385 (7th Cir.1987).

### II. *Rodriguez's Title VII Claim*

Under Title VII, it is unlawful to discriminate against an individual because of that individual's religion. 42 U.S.C. § 2000e–2(a)(1). "Religion" is defined, however, to include only those "aspects of religious observance and practice" that an employer is able to "reasonably accommodate . . . without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j); *see also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 63 & n. 1, 107 S.Ct. 367, 369 & n. 1, 93 L.Ed.2d 305 (1986).

■■ For purposes of its summary judgment motion, the City has conceded that Rodriguez has established a prima facie case

---

**1.** For purposes of this motion, the City does not challenge the authenticity of Rodriguez's beliefs.

**2.** Police officers may request relief (a "personal") for various reasons, for example to use the bathroom.

**3.** Rodriguez testified that he informed Grimes about his memo and his prior "arrangement" with Guswiler, but that Grimes still refused to take him off the assignment. Grimes denied this conversation occurred.

of religious discrimination.[4] Thus, the burden now shifts to the City to make a reasonable accommodation of Rodriguez's religious beliefs or to show that any accommodation would result in undue hardship. *E.E.O.C. v. Ilona of Hungary, Inc.*, 97 F.3d 204, 210 (7th Cir.1996); *Baz v. Walters*, 782 F.2d 701, 706 (7th Cir.1986). The only question before the Court is whether the City failed to reasonably accommodate Rodriguez's refusal to perform the abortion clinic detail.

A reasonable accommodation of an employee's religion is one that "eliminates the conflict between employment requirements and religious practices...." *Philbrook*, 479 U.S. at 70, 107 S.Ct. at 373. Title VII requires that the employer provide only "reasonable accommodation," not satisfaction of an employee's every desire. *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir.1993), *cert. denied*, 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994). Furthermore, "the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation ... [W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternatives would result in undue hardship." *Philbrook*, 479 U.S. at 68, 107 S.Ct. at 371.

Rodriguez argues that the City should have agreed to his proposed accommodation by keeping him off the abortion clinic detail before the alleged incident of discrimination took place on November 19, 1994. Rodriguez maintains that exempting him from abortion clinic detail was a reasonable accommodation, and one that the City could have provided without undue hardship. The City responds that exempting Rodriguez—or any other officer—from an assignment that conflicts with his religious beliefs would result in undue hardship to the City. More importantly though, the City contends that there were several alternative accommodations available to Rodriguez that he declined to utilize.

Specifically, under Section 23–8 of the governing union contract, police officers may bid to transfer between districts. Bids are granted on the basis of seniority. The City asserts, and Rodriguez does not dispute, that there are at least six alternative districts on the north side of the City that do not have abortion clinics and have comparable levels of crime and police facilities to those in the 14th District. With his seniority, Rodriguez would apparently be able to bid into any of those districts with no reduction in his level of pay or benefits. The City has described several additional alternatives available to Rodriguez to accommodate his religious beliefs including applying for a "special function assignment," changing his shift, changing his start time, using time due, and using unpaid leave.[5]

Rodriguez concedes that bidding on a transfer to another district that has no abortion clinics would, for the most part, accommodate his religious beliefs. Rodriguez also grudgingly concedes that he has no specific objections to transferring districts. Nevertheless, he maintains that he should not have to transfer districts when the City can accommodate his religious beliefs to avoid the abortion clinic detail in the 14th District without any undue hardship. The Supreme Court, however, disagrees and has declared:

> We find no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation.

*Philbrook*, 479 U.S. at 68, 107 S.Ct. at 371. Nevertheless, Rodriguez argues that his case is an exception to this general proposition because the City "ignored" his request for an accommodation and failed to take the initial step towards accommodating his religious beliefs.

At the outset, the Court notes that it is undisputed that as a 16–year veteran of the

---

4. The City reserves its right to appeal this issue.

5. Rodriguez acknowledges that he has been avoiding clinic duty since November 1994 by

changing to a later starting time, taking some Saturdays off, and accepting special function assignments out of the 14th District.

police force, Rodriguez was aware of the options available to him under the union contract that could accommodate his religious conflict. But, Rodriguez wanted a different accommodation; he wanted to stay in the 14th District and be exempt from abortion clinic duty. To this end, Rodriguez made an informal deal with Guswiler. Rodriguez agreed to go to the clinic in an emergency situation and Guswiler agreed to try to keep Rodriguez off clinic detail. Rodriguez knew that this was a makeshift solution and that there was no guarantee from Guswiler or the City that it would prevent him from being assigned to clinic duty. Rodriguez knowingly chose this accommodation over the other alternatives available to him under the union contract and accepted the risk that it might not last.

Whether or not he received a formal response to his October memorandum, Rodriguez was clearly aware that the City was unwilling to honor his deal with Guswiler on a formal or permanent basis. When the City assigned Rodriguez to guard the clinic on November 19, 1994, it did not discriminate against him because of his religion. This was a risk Rodriguez knew existed, and he consciously elected not to choose the option which would have prevented this possibility. Rodriguez, not the City, is therefore responsible for the consequences. *See Wright*, 2 F.3d at 216 (employee who chose not to take full advantage of employer bidding system is responsible for consequences).

The Court concludes that reasonable accommodations were available to Rodriguez that would have eliminated his religious conflict. Rodriguez was aware that these accommodations existed, but chose not to take full advantage of them. Under these circumstances, the Court does not believe that the City was required to formally reiterate these alternatives in response to Rodriguez's memorandum in order to discharge its obligations under Title VII.

■ Rodriguez maintains that the City is barred from asserting provisions of the union contract as "after-the-fact" accommodations because it ignored Rodriguez's original request for an accommodation in his October 1994 memorandum. As discussed above, the Court does not agree with Rodriguez's characterization of the union contract as an "after-the-fact" accommodation. The contract provision at issue was in place prior to Rodriguez's problems with the clinic detail and Rodriguez admits that he was aware of his rights under the union contract to request a transfer to another district. The essence of Rodriguez's objection to the transfer at this time is that the City has waived its ability to defend this lawsuit by failing to raise the accommodation earlier—before this litigation began.

Rodriguez has offered no legal support for the "waiver" rule that he is proposing to this Court. Instead, Rodriguez relies on *Toledo v. Nobel–Sysco, Inc.*, 892 F.2d 1481, 1488 (10th Cir.1989), *cert. denied*, 495 U.S. 948, 110 S.Ct. 2208, 109 L.Ed.2d 535 (1990), where the court ruled that a settlement offer, made in the course of administrative proceedings, could not be considered as an accommodation in defense of a Title VII lawsuit. Unlike the facts in *Toledo*, the accommodation described by the City was not offered to Rodriguez as a settlement after the commencement of legal or administrative proceedings. The alternatives under the union contract have always been available to Rodriguez and it is undisputed that he was aware of them. The Court must therefore conclude that Rodriguez simply decided not to take advantage of the options made available to him.

■ Rodriguez also contends that the transfer option provided for under the union contract is not applicable to this case because it "does not preempt his rights under Title VII or the [Police] Department's General Order 92–1." The City, however, has never contended that the union contract provisions "preempt" Rodriguez's claim. To the contrary, the City claims that the options offered by the union contract merely afford the means to satisfy Rodriguez's rights under Title VII. This Court agrees. The union contract provisions are not being used by the City as an excuse or a "shield" to deny Rodriguez an accommodation for his religious beliefs. Instead, they have been properly raised as "reasonable accommodations" available to Rodriguez to alleviate his reli-

gious conflicts as required by Title VII. *See Hudson v. Western Airlines, Inc.*, 851 F.2d 261, 266 (9th Cir.1988) (provisions in collective bargaining agreement provided means for employee to eliminate her religious conflict while preserving her employment status).

Finally, Rodriguez argues that the option to transfer districts is not a "reasonable accommodation" because he "has no guarantee that he will not be compelled to some other abortion clinic detail under some other circumstance in the future." Specifically, Rodriguez postulates that a hospital or clinic in one of the districts he transfers to might decide, at some later date, to perform abortions and thus force him to "chase around the City from district to district." This Court is unwilling and unable to engage in the hypotheticals offered by Rodriguez. The Supreme Court has declared that a reasonable accommodation of an employee's religion is one that "eliminates the conflict between employment requirements and religious practices...." *Philbrook*, 479 U.S. at 70, 107 S.Ct. at 373. The option to transfer to a district that does not have an abortion clinic detail eliminates Rodriguez's religious conflict for the foreseeable future and Rodriguez has presented the Court with no evidence to suggest otherwise.

## CONCLUSION

For the reasons stated above, Rodriguez's motion for summary judgment is denied, and the City's motion for summary judgment is granted.