Charan Singh KALSI, Plaintiff,

v.

NEW YORK CITY TRANSIT AUTHORITY, Defendant.

No. 94–CV–5757(JG).

United States District Court, E.D. New York.

Dec. 22, 1998.

Kip Watson, Mark B. Stumer & Associates, P.C., New York City, for Plaintiff.

Richard Schoolman, Evelyn Jonas, Office of General Counsel, New York City Transit Authority, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

GLEESON, District Judge.

Charan Singh Kalsi brings this action against his former employer, the New York City Transit Authority ("TA"), alleging religious discrimination. The initial complaint, filed December 1994, alleged claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, and Title VII. After extensive discovery, plaintiff sought leave to amend the complaint to add claims under section 296 of the New York State Human Rights Law, the New York State Constitution, the New York City Administrative Code, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. On November 7, 1997, in an order adopting the Report and Recommendation of the Honorable Cheryl L. Pollak dated August 13, 1997, such leave was granted. In the meantime, the Supreme Court declared RFRA unconstitutional, *see City of*

*Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), and that claim was deleted from the amended complaint.

The case concerns the conflict between two important interests—Kalsi's personal religious beliefs and the TA's safety policies for its employees. Specifically, plaintiff's religious beliefs prohibit him from wearing a hard hat, but the Car Inspector position he was fired from requires him, absent relief from this Court, to wear one.

The defendant has moved for summary judgment. The motion is granted.

## FACTS

Plaintiff is a member of the Sikh religion, which requires him to wear a turban on his head at all times, other than when he is sleeping or bathing. He contends, and for the purposes of this motion I accept as true, that his religion prohibits him from covering his turban.

The TA operates the subway system in New York City. Plaintiff was hired by the TA from a civil service list on December 6, 1993, when he began a one-week training period for a position as a Car Inspector. Car Inspectors work in subway maintenance shops and inspect, adjust, and perform repairs to electrical and mechanical equipment in subway cars.

### A. *The Hard Hat Policy for Car Inspectors*

Car inspectors do much of their maintenance work beneath floor-level tracks in TA maintenance shops. The space under the tracks is dug out to give Car Inspectors and other maintenance workers the ability to work on the underside of the subway car. These dug-out areas are referred to as "pits," and Car Inspectors perform maintenance tasks standing or stooping in them. The pits vary in depth, but are typically about four feet deep. Car Inspectors often work with an assistant; thus, there are often two people in the pit at a time.[1]

The car sits above the pit on its tracks, giving an additional one to one-and-a-half feet of headroom under the car. Into this cramped work space protrude various parts of the subway car—the propulsion control box, two air conditioning compressor units, two air conditioning receiver tanks, four motors, and four gear cases. A Car Inspector's duties include adjustments, inspections, and repairs to such equipment. The equipment almost always consists of hard metal, often with sharp edges. Some of the machinery is electrified when the cars are in the maintenance shops so that it may be checked, tested, and, if necessary, repaired.

There exist additional hazards on the ends of the undersides of subway cars. At one end is the "anticlimber," a curved metal protrusion that keeps colliding cars from piling up on one another. At the other end is the hard metal coupling used to connect cables from one car to another. Both pieces of equipment pose the risk of head injury to Car Inspectors as they walk out from under the cars. Car Inspectors also perform work on the side of the car, outside of the pit, where certain air conditioning equipment and the third-rail contact shoes are located. In addition, they perform certain of their duties inside subway cars, where they face the danger of swinging ceiling panels.

The policy in effect at the time plaintiff began his training required Car Inspectors to wear TA provided hard hats[2] in many areas of the maintenance shops, including the pits, alongside and inside subway cars, and near overhead hoists and cranes, areas

---

1. Useful photographs of a pit are appended as Exhibit 8 to the Reply Declaration of Richard Schoolman, Esq., dated July 16, 1998.

2. As used herein, the term "hard hat" means Class A or Class B head protection as defined by the American National Standards Institute ("ANSI") Standard Z89. Such head protection meets the standards for impact and low voltage insulation (Class A) or for impact and high voltage insulation (Class B).

in which most Car Inspectors work. The hard hat policy was intended to avoid injuries caused by the various hazards a Car Inspector encounters. The TA has submitted the affidavits of Lloyd Tyler, Senior Director of New Projects and Operations for the Car Equipment Division, and James Wincek, the Manager for Hazard Analysis for the Office of System Safety, in support of its description of the TA's hard hat policy and its purposes. The Wincek affidavit also sets forth a thorough review of the policy undertaken by the TA shortly before the plaintiff was hired.

In late 1992, the TA's Office of System Safety ("OSS") conducted an evaluation of the need for hard hats in TA maintenance areas. A request from the Division of Car Equipment ("DCE") prompted the evaluation. DCE employees, and Car Inspectors in particular, had expressed a desire to wear "bump caps" instead of hard hats. Bump caps are plastic helmets that provide a measure of protection against protruding equipment and dirt. However, there exist no standards for bump cap manufacturing, and the quality of their construction, and the degree of protection they afford, varies widely among manufacturers. As explained by the OSS in its February 3, 1993 memorandum regarding the evaluation of the hard hat requirement, in the past, maintenance employees (such as Car Inspectors) had the option to wear bump caps in lieu of hard hats. Because bump caps were more comfortable, their use became widespread; indeed, safety evaluations had revealed their use in areas where hard hats should have been worn. As a result, the TA implemented the hard hat requirement in all maintenance facilities. Because DCE employees were disgruntled by the blanket requirement to wear the more uncomfortable head protection, DCE asked OSS "to evaluate the use of hard hats versus bump caps by DCE Maintenance Facility employees working under rapid transit vehicles." Wincek Affidavit, Ex. A. DCE personnel had conveyed their view that hard hats were unnecessary "given the apparent absence of potential head injury hazards that require the use of hard hats which meet [ANSI] requirements." *Id.* Specifically, DCE questioned the need for a hard hat requirement in maintenance facilities that did not have overhead cranes.

The OSS evaluation included a review of accident reports, a survey of other transit systems' policies, Occupational Safety and Health Administration ("OSHA") regulations, New York Department of Labor regulations, and observations made during visits to maintenance sites. During the period evaluated (September 1989 through August 1992), there were fifty-five head injury incidents at the TA, twenty-four of which resulted in an aggregate of two hundred fifteen lost or restricted work days.

The report identified numerous safety hazards, including tools and parts falling from hoisted objects; hoisted objects themselves falling from cranes; fragments flying from metal and woodworking machinery; metal equipment protruding from underbodies of subway cars; panels and storm doors swinging inside the cars; and exposed and energized electrical conductors. The severity of the identified hazards ranged from marginal to catastrophic. The likelihood of injury from them ranged from improbable to probable.

The OSS report concluded, in pertinent part, that hard hats should be worn in maintenance pits, woodworking and metalworking areas, within subway cars, and in all areas of facilities with overhead cranes or hoists. The OSS evaluation recommended various other measures intended to maintain and enhance the safety of DCE employees.

The TA's affidavits submitted in support of its motion establish that hard hats are also intended to protect against fire dangers. In particular, the Car Inspectors use acetylene g10 torches in the pits to cut and connect pipes. The torches produce 900 degree flames up to three inches long. Also, the dust along the subway tracks can become very hot and spark or burn, caus-

ing embers to fly about and make contact with a Car Inspector's head. The hard hats guard against uncovered hair catching on fire. The presence of oily rags, oil, and solvents in the pits, all necessary to maintenance work, exacerbates the risk of major, fast-moving fires.

In addition, Car Inspectors' heads can easily come into contact with exposed electrified parts located underneath subway cars, such as high voltage wiring and register grids, which have to be electrified in order to test and adjust them. The hard hats that the TA requires its employees to wear protect the head against electric shock and electrocution.

Using boom cranes to lift and move heavy machinery, such as the air conditioning motors affixed to the underside of subway cars, also creates a danger of head injury. The overhead movement of such equipment in the maintenance shops presents another reason for the hard hat requirement.

### B. *Plaintiff's Experience at the TA*

Plaintiff took civil service tests for several positions at the TA and passed the test for Car Inspector in 1991. The TA hired him December 6, 1993, from a list of qualified applicants. It is undisputed that the civil service system permitted the TA to hire him only for the position of Car Inspector, and that it could not have switched him to a different position.

Early in his training, plaintiff was provided with a TA hard hat. There is a dispute as to whether plaintiff ever wore it. I accept plaintiff's assertion that he never did. In any event, there is no dispute that on December 10, 1993, while in training at the TA's Coney Island maintenance facility, plaintiff refused to wear the hard hat. He told his instructor, Maintenance Supervisor Anatole Novell, that he could not wear the hard hat for religious reasons. He also showed Novell a copy of a ruling of the Occupational Safety and Health Administration ("OSHA"), which,

plaintiff contends, exempts Sikhs from hard hat requirements.

Novell told plaintiff that he did not care what the OSHA policy was, and that he had to wear the hard hat or he would be fired. Plaintiff was not told or expected to remove his turban, but he was told to wear his hard hat over it. When he refused, Novell referred him to the Employee Development Unit, where plaintiff was told that he had to wear the hard hat or he would be referred to the Labor Relations Department. Plaintiff again refused to do so.

On that same day, plaintiff gave a handwritten memorandum on TA letterhead to Dev Levin, who is presumably a TA manager. It requested that plaintiff be excused from the hard hat requirement on religious grounds.

On December 15, 1993, plaintiff met with a manager in the Labor Relations Department and with a union official. He was given another opportunity to comply with the hard hat requirement at that time, but again he refused based on his religious beliefs. *See* Johnson Affidavit, Ex. D. On December 27, 1993, plaintiff sent a letter to TA President Alan Keipper. Strictly speaking, the letter sought only that action be taken against Novell and "a manager, Mr. William Jones," Plaintiff's Rule 56.1 Statement, Ex. F, but for the purposes of this motion, I accept plaintiff's characterization of the letter as another request for an accommodation.

On January 4, 1994, the TA's Director of Labor Relations filed a "Recommendation To Prefer Charges For A Special Probationary Hearing," which charged plaintiff, in essence, with violating safety rules and disobeying orders of his supervisor. On January 19, 1994, a special probationary hearing was conducted pursuant to § 5.2.7 of the Rules and Regulations of the New York City Personnel Director, as plaintiff was a probationary civil service employee with less than two months' experience. The hearing officer was Patrick Ryan. Plaintiff was present, represented by coun-

sel. The management position—that the safety rules mandating hard hats could not be waived for plaintiff—apparently relied in substantial part on the OSS evaluation of the need for hard hats, which resulted in the February 8, 1993 memorandum described above. Plaintiff claimed to be exempt from any such requirement on account of his religious beliefs and practices. At the conclusion of the January 19, 1994 hearing, the record was left open to permit each side to submit additional documentation. Johnson Affidavit, Ex. F.

Before a decision was rendered, the TA endeavored to accommodate plaintiff by placing him in one of the few Car Inspector positions that do not require a hard hat. On February 16, 1993, as "a follow-up" to the special probationary hearing, Christopher Johnson, the TA's Senior Director of Labor Contract Disputes, wrote to Dennis Calhoun, the Vice President of the Transport Workers Union of America, Local 100 ("TWU"), which represents TA Car Inspectors. Johnson proposed that plaintiff be placed in a "bench job," i.e., one of the rare Car Inspector positions in which tasks are performed in non-hard hat areas. The TA needed the union's permission because the collective bargaining agreement provided that job assignments for employees within a particular title, such as Car Inspector, must be "picked" by employees in order of seniority. Accordingly, in order for plaintiff, who had been hired only a few weeks earlier, to receive a highly desirable bench job, the TWU would have to waive the seniority rights of other union members. Calhoun informed Johnson that he would not do so. Johnson Affidavit ¶ 3 and Ex. E.

On February 28, 1994, the hearing officer rendered his decision. Concluding that the safety of the TA's employees demanded that the hard hat rule be enforced,

he upheld the TA's decision to terminate plaintiff.

On March 16, 1994, Manlio Di Preta, an attorney for the TWU, wrote a letter to Johnson, which claimed that the TWU was prepared to accommodate plaintiff but would not waive the seniority rights in the collective bargaining agreement.[3] Johnson wrote back on March 29, 1994, asking Di Preta for a specific proposal of an accommodation that could be made without a waiver of the seniority provisions. Neither Di Preta nor any other TWU representative responded to the TA's request.

At his deposition in 1996, Calhoun suggested that plaintiff could have been accommodated in an informal way, without requiring the TWU to waive the seniority provisions of its contract. Calhoun did not state precisely what that accommodation might have been. He stated only that "we do make accommodations as a union for our brothers and sisters regarding hardships. As an example, if your wife gets sick and you can no longer work weekends ... your brothers and sisters will step aside, allow you to fulfill a function" where weekends are not required. Calhoun Deposition at 14–15, Plaintiff's 56.1 Statement, Ex. I. In other words, although the union would not "officially" sanction the TA's proposed accommodation of plaintiff, Calhoun suggested (but did not say outright) that it might look the other was if plaintiff were to work in non-hard hat areas. Id. Calhoun stated that this type of unofficial accommodation occurs "with the understanding of the Authority and their full knowledge, but it's done on a temporary basis." Id. Johnson was not informed of Calhoun's "unofficial" proposal in 1994. In any event, the TA needed to protect itself against future grievances by other Car Inspectors that seniority rights were violated by the assignment of plaintiff to a

---

**3.** Neither side has submitted the letter from Di Preta. The Johnson letter responding to Di Preta characterizes the TWU's proposal as one to place plaintiff "in a car inspection position which would not require the wearing of a helmet." Johnson Affidavit, Ex. G. Plaintiff does not dispute the defendant's characterization of the Di Preta letter.

"bench" job, and it is undisputed that the union refused to provide that protection.

## DISCUSSION

### A. The Summary Judgment Standard

Courts must grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether material facts are in dispute, courts must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1223 (2d Cir.1994). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-moving party cannot survive a properly supported motion for summary judgment by resting on its pleadings "without offering 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).[4]

### B. The Title VII Claims

#### 1. The Disparate Treatment Claim

Title VII of the Civil Rights Act of 1964 provides, in pertinent part as follows:

> It shall be an unlawful employment practice for an employer
>
> (1) ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). With the goal of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court established the analytical framework for such claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and in *Burdine*. Under this analysis, the burden to persuade the trier of fact "that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff," while the burden of production shifts as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory rea-

---

**4.** Plaintiff argues that the affidavits submitted by defendant should not be given credence because they are affidavits of managing employees of the TA who played roles in the events giving rise to the case. While plaintiff is correct that credibility determinations are the province of a factfinder, in order to survive summary judgment, the opposing party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga v. March Of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) (citations omitted). Thus, at this stage, plaintiff may not fend off summary judgment by relying on general attacks on credibility. *See Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (citing *Crawford–El v. Britton*, 523 U.S. 574, 118 S.Ct. 1584, 1598, 140 L.Ed.2d 759 (1998)).

son for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Thus, a court must enter summary judgment for defendant when the plaintiff (1) fails to put forth a prima facie case; or (2) fails to present evidence contradicting a legitimate reason, offered by the defendant, for plaintiff's discharge.

### a. *The Prima Facie Case*

■ In order to establish a prima facie case of discrimination, the plaintiff must demonstrate that (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) his discharge occurred under circumstances giving rise to an inference of discrimination. *See Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991). Once established, a prima facie case requires judgment for the plaintiff when the employer cannot provide a non-discriminatory basis for termination, since "we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (citation omitted). The burden of establishing a prima facie case has been described as "not onerous," *id.* at 253, 101 S.Ct. 1089, and "light," *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996). *See also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("Quite obviously ... what is required to establish the *McDonnell Douglas* prima facie case is infinitely less than what a directed verdict demands."); *Kerzer v. Kingly Mfg.,* 156

F.3d at 401 (describing plaintiff's burden as "de minimis").

Defendant challenges plaintiff's claim of a prima facie case of discrimination only with regard to the fourth element—it claims that plaintiff cannot allege circumstances giving rise to an inference of discrimination. Notwithstanding the low threshold described above, I agree that plaintiff has failed to cross it and that his disparate treatment claim must therefore be dismissed.

■ While "there is no unbending or rigid rule about what circumstances allow an inference of discrimination when there is an adverse employment decision," *Chertkova,* 92 F.3d at 91, plaintiff cannot simply rely on the fact that he was terminated. Rather, he must point to facts that suggest the termination was motivated, at least in part, by religious animus. Such facts include: (1) actions or remarks made by decisionmakers that could be viewed as reflecting discriminatory animus; or (2) preferential treatment given to employees outside the protected class; or (3) in a corporate downsizing, the systematic transfer of a discharged employee's duties to other employees; or (4) a pattern of recommending the plaintiff for positions for which he is not qualified and not recommending him for positions for which he is qualified; or (5) the fact that following plaintiff's termination, defendant continued to seek applicants to fill the position. *See id.* at 91–92 (citing cases).

■ Plaintiff has failed to establish an inference of discrimination in any of these ways. There exists no evidence in the record of any discriminatory animus of the sort present, for example, in *Rosen v. Thornburgh,* 928 F.2d at 530–32. The only attempt to establish such animus was made for the first time at oral argument, when plaintiff pointed to what he described as a discriminatory remark by his supervisor, Novell, when plaintiff refused to put on his hard hat on December 10, 1993. In his December 27, 1993 letter to the presi-

dent of the TA, plaintiff stated that when he informed Novell that employers who allow employees to work without hard hats for religious reasons would not be sanctioned by OSHA, Novell responded "with obscene and offensive language" to the effect that OSHA's ruling did not apply to the TA. Plaintiff's 56.1 Statement, Ex. F.[5] Plaintiff conceded at oral argument that these unspecified remarks were not religious in nature, but asserts that the context surrounding them evidences discriminatory intent. I disagree.

First, foul language aside, the supervisor was right: OSHA rulings do not apply to the TA. The TA is regulated not by OSHA but by the Public Employee Safety and Health Bureau ("PESH Bureau") of New York State's Department of Labor. *See* Wincek Affidavit ¶ 2(b). However, I do not place great weight on the substantive accuracy of the supervisor's remarks. He does not appear from plaintiff's description to be a hair-splitter, and the PESH Bureau follows OSHA safety standards, including its non-citation policy for employees who refuse to wear head protection for religious reasons. Plaintiff's Rule 56.1 Statement, Ex. J. Thus, although the OSHA policy that plaintiff cited was inapplicable to the TA, the identical policy did in fact apply through the PESH Bureau.

Even assuming, as I do, that the supervisor was aware of that, his coarse treatment of plaintiff does not support an inference of discrimination. Plaintiff had earned a job that indisputably has safety hazards. The TA had evaluated those hazards and concluded that they warranted the hard hat policy. Its supervisors were responsible for enforcing that policy. On December 10, 1993, in the workplace, during on-the-job training, plaintiff refused to comply with the hard hat policy and showed his supervisor a copy of the non-citation policy and a newspaper clipping

about it. It is undisputed, though, that the non-citation policy neither excuses the TA from the obligation to provide a safe workplace for its employees nor insulates it from liability if it breaches that obligation. Indeed, as stated in the PESH Bureau letter upon which plaintiff relies, the policy is limited only to the issuance of citations, and the bureau is "not in a position to direct the employer to change any internal policy he may have which would require an employee to wear a safety hat as a condition of employment." Plaintiff Rule 56.1 Statement, Ex. J. In short, the PESH Bureau policy leaves intact the dangers of the job, the hard hat requirement, and the TA's obligation to provide a safe workplace. If plaintiff, and perhaps others, were injured as a result of his refusal to wear the hard hat, the mere fact that the PESH Bureau would refrain from issuing a citation would be small consolation indeed.

Against that backdrop, plaintiff mistakenly asserted to Novell that he was "excused" from the hard hat requirement by the "head" of OSHA. *See* Plaintiff's Rule 56.1 Statement, Ex. E. That Novell responded with an "obscene remark regarding OSHA's ruling," Plaintiff's Rule 56.1 Statement, Ex. F, is hardly surprising. In any event, there exists no basis for an inference that this instance of swearing in the workplace evidenced invidious discrimination.

■ Plaintiff also contends that a discriminatory intent may be inferred from the fact that when he refused to wear the hard hat he was cursed at, whereas when other employees complained about the policy, the TA commissioned a study regarding the necessity of the hard hats. This argument has no merit either. Plaintiff is referring to the DCE employees who grumbled about wearing hard hats, whose dissatisfaction led to the 1993 OSS report described earlier. Those employees were

---

5. In his affidavit submitted in opposition to the motion, plaintiff's detailed description of the events of December 10, 1993 makes no mention of the alleged obscene language on which he now relies.

not situated similarly to plaintiff. There is a world of difference between a refusal to comply with a safety requirement and a complaint about the requirement by employees who nevertheless comply with it. Indeed, plaintiff's claim is undermined, not supported, by the fact that the TA had evaluated the hard hat policy at the request of those other employees. That evaluation, which occurred before the TA hired plaintiff, produced the conclusion that safety considerations necessitated the hard hat requirement. That the TA did not undertake a repetition of this study when faced with plaintiff's recalcitrance a few months later does not evidence discriminatory intent.

■ Plaintiff also fails to allege the sort of preferential treatment that would support an inference of discrimination. He relies on the fact that the TA allowed another employee who wore a turban to work without wearing a hard hat. An inference of discrimination may well exist where a similarly situated, non-Sikh employee was not discharged or suspended for failing to wear a hard hat. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). But here, the other employee, Jagdip Singh Ahluwalia, was neither similarly situated nor non-Sikh. Rather, he was a maintenance supervisor who had never been a Car Inspector. In 1996, he was reassigned to a "car deck" assignment, a non-hard hat assignment for maintenance supervisors analogous to the "bench job" assignment for Car Inspectors. The reassignment, which accommodated Ahluwalia's religious practice, needed no union agreement, as he was a supervisor and thus not represented by the union. Thus, the TA's failure to take adverse employment action against him for not wearing a hard hat does not support an inference of religious discrimination against plaintiff.

■ Plaintiff further relies on his assertion that the TA does not enforce its safety policy for certain types of required foot wear. Plaintiff bases this assertion on his claim that infractions of this policy went observed, apparently without repercussion. However, the fact that the TA may enforce different safety rules to different degrees does not support an inference that its more stringent enforcement activities result from invidious discrimination. An employee who fails to wear safety shoes is not comparable to plaintiff. The nature of the insubordination is different, and the TA's lax enforcement of a foot wear policy sheds no light on the necessity or flexibility of its head protection policy or the motives for its enforcement.

■ Finally, at oral argument, plaintiff argued that an inference of discrimination can be drawn from the failure of the 1993 OSS memorandum to discuss the rights of religious minorities when addressing the need for hard hats in the performance of subway car maintenance. According to plaintiff's counsel, the memorandum cannot evidence a neutral policy because it fails to mention the significance of religious beliefs. The argument has no merit. The OSS report responded to a request to consider the relative merits, from a safety perspective, of hard hats and bump caps. That it did so with explicitly mentioning the possible impact of safety on religious beliefs simply does not reveal, as plaintiff contends, a "deliberate indifference" to those beliefs.

In sum, Plaintiff has failed to establish that his discharge occurred in circumstances giving rise to an inference of discrimination.

b. *The TA's Proffered Non–Discriminatory Reason for Plaintiff's Discharge*

■ In any event, even assuming plaintiff could establish a prima facie case of discrimination, he has failed to raise a genuine question of fact as to whether the legitimate reasons offered by the defendant for discharging him were a pretext

for discrimination. The TA argues that its non-discriminatory, legitimate interest in protecting its employees from workplace hazards justifies its hard hat policy. It has offered substantial evidence, summarized above, supporting this contention. The safety-based hard hat requirement, and plaintiff's refusal to comply with it, constitute a non-discriminatory explanation for the termination of plaintiff. *See, e.g., Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1124 (11th Cir.1993) (stating that violation of safety rules intended to protect employees from workplace hazards are obvious non-discriminatory explanations); *Worthy v. Steel Corp.,* 616 F.2d 698, 701 (3d Cir.1980) (same). Plaintiff therefore must demonstrate that this proffered reason was pretextual and that, more likely than not, the true reason was the illegal discrimination that plaintiff alleged. *See Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997).

> In the summary judgment context, this means "that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision."

*Kerzer v. Kingly Mfg.,* 156 F.3d 396, 401 (2d Cir.1998) (quoting *Gallo v. Prudential Servs. Ltd. Partnership,* 22 F.3d 1219, 1225 (2d Cir.1994)).

Plaintiff does not dispute that he was fired for failing to wear a hard hat, or that the TA actually had a policy requiring Car Inspectors to wear hard hats. Rather, plaintiff argues that the hard hat policy was not necessary for all Car Inspectors at all times. Plaintiff relies on the expert opinion of Leo Debobes, a safety consultant. Debobes' opinion will be discussed more fully below; for purposes of this discussion, it is sufficient to note that the mere fact that a challenged policy may be subject to debate does not support an inference that it is a pretext. "Title VII may not be used as a vehicle for second-guessing an employer's business judgment; instead, plaintiff bears the burden of establishing that the employer imposed arbitrary or unreasonable demands as a cover for discrimination." *Davidson v. Time, Inc.,* 972 F.Supp. 148, 153 (E.D.N.Y.1997); *see also Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998) (stating that Age Discrimination In Employment Act "does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age"), *cert. denied,* —— U.S. ——, 119 S.Ct. 511, 142 L.Ed.2d 424 (1998). Plaintiff has failed to raise any genuine issue of fact with respect to either the bona fides of the TA's hard hat rule or that plaintiff was fired for failing to comply with it. Accordingly, plaintiff's Title VII disparate treatment claim must be dismissed for this reason as well.[6]

### 2. The Reasonable Accommodation Claim

#### a. The Prima Facie Case

■ Under Title VII, an employer cannot discriminate against any employee's religious practices unless the employer can show it cannot reasonably accommodate the practice without undue hardship on the conduct of the employer's business. *See*

---

**6.** Courts analyze claims of illegal discharge brought under the New York Human Rights Law ("NYHRL") under the *McDonnell–Douglas* framework. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992). Furthermore, under the NYHRL, an employer has no obligation (except in the limited case of Sabbath observers) to accommodate an employee's religious practices. *See Engstrom v. Kinney Sys., Inc.,* 241 A.D.2d 420, 661 N.Y.S.2d 610, 613 (1st Dep't), *leave to appeal denied,* 91 N.Y.2d 801, 666 N.Y.S.2d 563, 689 N.E.2d 533 (1997). Therefore, plaintiff's claim under the NYHRL, as well as his claim under the New York City Administrative Code, which is analyzed in the same way as claims under the NYHRL, *see Alie v. NYNEX Corp.,* 158 F.R.D. 239, 244 (E.D.N.Y.1994), are dismissed as well.

42 U.S.C. § 2000e(j); *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 63, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). In order to establish a prima facie case of discrimination under this provision, the plaintiff bears the burden of demonstrating that: (1) he has a bona fide religious belief or practice that conflicts with an employment requirement; (2) he informed the employer of this belief or practice; and (3) he was disciplined for failing to comply with the conflicting employment requirement. *See Sable v. Stickney,* 91 CIV. 8038, 1993 WL 267337, at *7–*8, (S.D.N.Y. July 13, 1993) (citing *Philbrook v. Ansonia Bd. of Educ.,* 757 F.2d 476, 481 (2d Cir.1985), *aff'd,* 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986)). There is no dispute that plaintiff has established a prima facie case of discrimination.

### b. The TA's Claim Of Undue Hardship

The burden therefore shifts to the defendant to demonstrate either that the employer made a reasonable accommodation of the religious practice (even if it is not the accommodation the employee prefers) or the employer was not able to accommodate the employee without undue hardship. *See Sable,* 1993 WL 267337, at *7 (citing *Ansonia,* 479 U.S. at 67–68, 107 S.Ct. 367). Put another way, where the employer fails to provide an accommodation that eliminates the religious conflict, it must either accept the employee's proposal or demonstrate that it would cause undue hardship were it to do so. *See Opuku–Boateng v. State of California,* 95 F.3d 1461, 1467 (9th Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *see also Rodriguez v. City of Chicago,* 156 F.3d 771, 775 (7th Cir.1998); *Getz v. Pennsylvania Dep't of Pub. Welfare,* 802 F.2d 72, 73 (3d Cir.1986).

Here, the TA failed to offer to plaintiff an accommodation that would have eliminated the conflict between its hard hat policy and plaintiff's religious practice. Thus, I turn to plaintiff's proposed accommodations and to the TA's contention that they would cause undue hardship.

Title VII's obligation to make a reasonable accommodation of religious practices should not be confused with the obligation imposed by the Americans With Disabilities Act ("ADA") to make reasonable accommodation of disabilities. Perhaps because the accommodation of religious beliefs and practices raises constitutional questions under the Establishment Clause, the Supreme Court has interpreted narrowly Title VII's duty to make reasonable accommodations, holding that any accommodation imposing "more than a de minimis cost" amounts to an undue hardship. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *see also* Pamela S. Karlan & George Rutherglen, *Disabilities, Discrimination, and Reasonable Accommodation,* 46 Duke L.J. 1, 6–7 (1996). Thus, in stark contrast to the ADA's reasonable accommodation requirement, which has been interpreted broadly, the obligation under Title VII is "very slight." Karlan & Rutherglen at 7.

Whether accommodation of an employee's religious practice would cause an employer undue hardship "must be determined based on the particular factual context of each case." *Gordon v. MCI Telecomm. Corp.,* 791 F.Supp. 431, 435 (S.D.N.Y.1992) (internal quotations marks and citations omitted). After *Hardison,* however, employers have routinely defended refusals to accommodate religious practices by citing the effect that an accommodation might have on other employees, and courts have routinely held that such effects constitute undue hardship for the employer. *See, e.g., Brener v. Diagnostic Ctr. Hosp.,* 671 F.2d 141, 147 (5th Cir.1982) ("Brener's characterization of complaints by others as mere grumbling underestimates the actual imposition on other employees in depriving them of their shift preference at least partly because they do not adhere to the

same religion as Brener."); *Cook v. Chrysler Corp.*, 779 F.Supp. 1016, 1023 (E.D.Mo.1991) ("Granting Cook a preference in the seniority structure ... would create very hard feelings among Cook's fellow employees..... The Court can only imagine the degree of animosity and hostility such a move would create."), *aff'd*, 981 F.2d 336 (8th Cir.1992). Indeed, some courts have equated a more than de minimis impact on coworkers with a more than de minimis cost to the employer. *See, e.g., Bhatia v. Chevron U.S.A., Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) ("An employer may prove that an employee's proposal would involve undue hardship by showing that either its impact on co-workers or its cost would be more than de minimis."). *But see Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 519 (6th Cir.1975) (stressing that courts should be "somewhat skeptical" of assertions that untested accommodations will produce "chaotic personnel problems").

Thus, even when the employee's proposed accommodation is relatively innocuous, such as a shift change to permit the employee to observe a Sabbath, Title VII is not especially hospitable.[7] Where, as here, the proposed accommodation threatens to compromise safety in the workplace, the employer's burden of establishing an undue burden is light indeed. "[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business." *Draper*, 527 F.2d at 521.

■ Plaintiff asserts that there are several ways in which the TA could have accommodated him. First, he contends that the TA could have placed him in a bench job, one of the rare Car Inspector positions which did not require the wearing of a hard hat, despite the TWU's seniority policies. But defendant correctly asserts that where a proposed accommodation violates a legitimate seniority system, adopted without discriminatory intent, the accommodation "would, as a matter of law, cause undue hardship." *Balint v. Carson City, Nev.*, 152 F.3d 1223 (9th Cir.1998); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). The TA and the TWU had a bona fide, seniority-based system in place for assigning jobs within particular civil service ranks. Accordingly, the TA had no duty to accommodate plaintiff by placing him in one of the choice Car Inspector's jobs that did not require the wearing of a hard hat. *See Hardison*, 432 U.S. at 79, 97 S.Ct. 2264; *Balint*, 152 F.3d 1223.

■ The same analysis applies to plaintiff's belated suggestion, based on Calhoun's 1996 deposition testimony, that the TA be required to allow an "informal" accommodation of plaintiff by other union employees. As discussed above, it is not clear exactly how this proposal would have worked. Calhoun testified that he was not prepared "officially" to waive other union members' seniority rights, but said "we do make accommodations as a union for our brothers and sisters" by switching shifts "on a temporary basis." Plaintiffs' Rule 56.1 Statement, Ex. I. Presumably, this temporary, unofficial solution contemplated the union and the TA looking the other way while plaintiff occupied one of the Car Inspector bench jobs. But *Hardison* spe-

---

7. The narrow breadth of the right to religious accommodation under Title VII permits courts in many cases to avoid difficult and awkward inquiries into the sincerity of claimed religious beliefs and into the tenets of the religion itself. For example, the conclusion that sufficient accommodation of Islamic practices had been made in *Gay v. S.U.N.Y. Health Science Center of Brooklyn*, No. 96–CV–6065, 1998 WL 765190 (E.D.N.Y. July 22, 1998), eliminated the need to determine the sincerity of the plaintiff, who by the time the motion was argued had abandoned the practice at issue in order to pay homage to his American Indian heritage. *See id.* at *1. Similarly, the papers submitted on this motion reveal that if this case were to proceed, the question whether the Sikh religion forbids the covering of turbans with other headgear would require resolution.

cifically states that the duty to accommodate does not require the employer "to take steps inconsistent with the otherwise valid [seniority system] agreement," 432 U.S. at 79, 97 S.Ct. 2264, formally or informally.

■ Plaintiff argues next that the hard hat policy could have been modified to allow him to work safely as a Car Inspector without a hard hat. This argument relies on the report of his expert, Debobes, who concluded that plaintiff's position "should not have required a hard hat." *See* Plaintiff's 56.1 Statement, Ex. L at 9. Based on Debobes' report and plaintiff's memorandum of law, it appears that plaintiff's proposal for modification of the hard hat policy encompasses two possibilities: (1) that plaintiff could have been assigned specific Car Inspector duties, such as working inside the car bodies, where the risk of head injury is more remote; and (2) that plaintiff could have been allowed to take "non-compensatory breaks" from work when the team he was on was performing tasks where the TA believes a hard hat is most necessary. I conclude that the undisputed facts require the conclusion that the accommodations proposed by the plaintiff would impose an undue hardship on the defendant.

There is a legal dimension to Debobes' report that undermines his conclusions. He wrote it before the Supreme Court invalidated the Religious Freedom Restoration Act ("RFRA"), and his conclusions are based in significant part on the outdated assumption that RFRA governs this case. Thus, Debobes states that the TA's hard hat policy is "contrary to the intent of the Religious Freedom Restoration Act of 1993," and concludes that the chance and potential severity of head injuries without hard hats "does not warrant the infringement of protected religious freedoms." Debobes Report at 9.

The report also misapprehends the regulatory landscape. Specifically, Debobes shares plaintiff's mistaken understanding of the non-citation policy of OSHA and PESH. Debobes characterizes that policy as an exemption from hard hat requirements for Sikhs, and asserts that "both OSHA and PESH have clearly identified the need for religious freedom as outweighing the need for head protection" where safety considerations and religious practices conflict. *Id.* at 6, 9. As explained above, neither assertion is correct.

Because Debobes' report offers an opinion on the ultimate issue in this case—whether the TA's interest in safety in the workplace justifies its refusal to accommodate plaintiff's religious practice—the outdated and mistaken assumptions about the law render the report almost useless.

Stripped of its discussion of the law, Debobes' report sets forth facts that support the TA's position more than plaintiff's. For example, the report does not dispute the TA's assertion that hard hats protect workers from electrical hazards while working on energized parts. Rather, it proposes various alternatives to dealing with those hazards, including "serious modifications of the existing electrical safety and lockout/tagout requirements," the implementation of "engineering controls" combined with employee training and periodic inspections, and the use of rubber matting, blankets, and covers. Debobes' Report at 5–8. Similarly, Debobes acknowledges that the use of overhead hoists poses dangers requiring hard hats, but suggests that modification could be made to the workplace "to prevent persons from walking under the equipment." *Id.* at 5. These and other suggestions by Debobes call upon the TA to make significant modifications to the workplace at costs that, at the very least, cannot be described as de minimis.

Debobes further concedes, albeit implicitly, that accommodating plaintiff will increase the risk of head injury. He asserts that the risk is circumscribed by the limited space for movement in the pits and ameliorated by the "limited protection" afforded by the turban. The risk that re-

mains if plaintiff wears only a turban is that he will suffer a head injury that is not "sufficiently catastrophic," Debobes concludes, to permit the interference with his religious practice. *Id.* at 6–7. Even assuming that Debobes is correct about the degree of risk, Title VII does not require employers to absorb the cost of all less than catastrophic physical injuries to their employees in order to accommodate religious practices.

The potential costs to the TA of permitting plaintiff to perform Car Inspectors' work without a hard hat of course include the cost of injury to plaintiff himself. Those costs are potentially substantial, particularly if he suffers catastrophic injury. The TA, which has been authorized by New York State to "self-insure" for Workers Compensation purposes, would bear them, and plaintiff concedes that he cannot waive that protection.

Moreover, the potential for injury goes beyond the plaintiff. Car Inspectors do not work alone. If plaintiff's turban catches fire in a pit, for example, he may not be the only one burned, especially if conditions exist that will accelerate the fire. If he is electrocuted while performing a task with another employee, that employee may suffer injury too, either from the electric shock or the sudden incapacitation of plaintiff. Others might well suffer injury in rescuing plaintiff from accidents caused by his decision not to wear the hard hat. An accommodation that requires the TA to bear these risks would impose an undue hardship on it.

 Plaintiff's proposal of an accommodation by which he would take "non-compensatory breaks" when his job would otherwise require him to perform hard hat-requiring tasks fares no better. First, plaintiff did not propose it until the instant motion was briefed. Second, it would violate the collective bargaining agreement with the TWU, which requires that Car Inspectors be paid for forty hours per week. Third, plaintiff has failed to counter the affidavit of Wayne Gallante, of the TA's Car Equipment Division, which states that such an arrangement would be unworkable. A Car Inspector's workday cannot be forecast with precision, and the great majority of the routine tasks require a hard hat. Plaintiff's scheme would require the assignment of a shadow Car Inspector; a fulltime, fully paid substitute to be immediately available if plaintiff's job required him to go, for example, under a hoist or in a pit.[8]

Plaintiff's suggestion that he work principally on propulsion systems is based on the erroneous premise that those systems are not underneath subway cars. In fact, they often are located there, and must be repaired from within the pit. Galante Declaration ¶ 4.

Because all of the plaintiff's proposed accommodations, even the belatedly-proposed ones, would impose an undue hardship on the TA, his Title VII reasonable accommodation claim is dismissed.

3. *The Belated Claim of Disparate Impact*

Disparate impact claims challenge practices that are neutral on their face but in practice adversely impact a class of protected persons disproportionately. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S.

---

8. In *Bhatia v. Chevron U.S.A., Inc.,* the Ninth Circuit affirmed a grant of summary judgment for Chevron in similar circumstances. Chevron had instituted a new policy requiring all employees with potential exposure to toxic gases, including machinists, to shave any facial hair that prevented them from achieving a gas-tight face seal when wearing a respirator. Plaintiff, a Sikh machinist, refused to comply, and as a result was given a lower-paying job as a janitor. 734 F.2d 1382, 1383 (9th Cir.1984). The Ninth Circuit held that Chevron had established that retaining the plaintiff as a machinist would cause undue hardship. It reasoned that if Chevron were required to assign plaintiff only duties involving no exposure to toxic gas, it would have to revamp its system of duty assignments to accommodate the need for predicting whether particular assignments involved potential exposure to toxic gases, and the plaintiff's co-workers "would be required to assume his share of potentially hazardous work." *Id.* at 1384.

424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In such cases, statistics on the impact of the policy on the protected group in question often represent the principal, and sometimes sole, vehicle for making a prima facie case.

At oral argument of this motion, plaintiff's counsel asserted for the first time that he was pursuing a disparate impact claim based on the TA's hard hat policy. Plaintiff did not allege such a claim in the complaint. He took no discovery that would have brought to light the facts necessary to evaluate such a claim. It was not raised in December 1996, when plaintiff sought and was granted leave to amend the complaint to add federal and state claims. It was not argued in any of plaintiff's submissions to the Court on this motion. Finally, plaintiff has not even sought leave to amend the complaint to assert a disparate impact claim. If he had, I would have denied the application. *See Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir.1993) (denying plaintiff leave to amend to assert disparate impact claim after close of discovery).

## C. *The § 1983 Claim*

Plaintiff bases his § 1983 claim on an alleged violation of his First Amendment right to the free exercise of religion, made applicable to state and local governments by the Fourteenth Amendment. In *Employment Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), the Supreme Court held that it is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the "incidental effect" of an otherwise valid provision. 494 U.S. at 878–79, 110 S.Ct. 1595; *see also Genas v. New York Dep't of Correctional Servs.*, 75 F.3d 825, 831 (2d Cir.1996). While plaintiff has alleged intentional discrimination, *see Navarro v. Block*, 72 F.3d 712, 716 (9th Cir.1995); *Silver v. City Univ. of N.Y.*, 947 F.2d 1021, 1022–23 (2d Cir.1991), he has failed to offer any proof to support that allegation. Accordingly, plaintiff's § 1983 claim is dismissed.

## D. *The Claim Under the New York State Constitution*

The New York Court of Appeals has stated that Article I, § 11 of the New York State Constitution, which prohibits discrimination because of race, color, creed, or religion, "was not intended to create a duty without enabling legislation but only to state a general principle .... The Legislature subsequently implemented those guarantees by provisions of various statutes ...." *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129 (1996). Accordingly, there is no cause of action under the state constitution itself.

In response to a question at oral argument as to why his claim under the state constitution was not barred by *Brown*, the plaintiff submitted a letter stating that *Brown* is inapplicable because section 3 of Article I of the Constitution is self-executing. In response, the defendant has correctly pointed out that plaintiff's Amended Complaint twice makes clear that he is suing under section 11 of Article I of the State Constitution. *See* Amended Complaint ¶¶ 2, 29. Plaintiff now claims that the reliance on section 11 of Article I in the Amended Complaint was a "misnomer," and professes to be "more than willing to amend [the Amended Complaint] to cure this 'technical deficiency.'" Letter from Mark Stumer, Esq., dated August 25, 1998. Construing this as an application to once again amend the complaint, I deny it. It comes too late, after extensive discovery and after briefing and argument of the motion for summary judgment. To permit it now would be unfair to the defendant.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted.

So Ordered.