Earl W. RICE, Plaintiff,

v.

U.S.F. HOLLAND, INC., Defendant.

No. CIV.A. 1:03–CV–3820–.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 5, 2005.

James E. Rollins, Lawrence Russell Kosten, Thompson Rollins Schwartz & Borowski, Decatur, GA, Mitchell A. Tyner, Office of General Counsel, Seventh Day Adventist Church, Silver Spring, MD, for Plaintiff.

Timothy Riker Newton, Constangy Brooks & Smith, Atlanta, GA, for Defendant.

### ORDER

CARNES, District Judge.

The above entitled action is presently before the Court on the Magistrate Judge's Report and Recommendation [43] denying defendant's Motion for Summary Judgment on plaintiff's Title VII religious discrimination claim [33]. Defendant filed objections to the Report and Recommendation on March 23, 2005[44] and plaintiff filed a Reply to defendant's objections on April 11, 2005[45].

The Court agrees with the Magistrate Judge's recommendation to deny defendant's Motion for Summary Judgment and that motion is hereby **DENIED**.

The parties shall file their Joint Proposed Consolidated Pretrial Order by MONDAY, AUGUST 8, 2005, in accordance with Local Rule 16.4 and the attached Civil Trial Instructions, which require JOINT voir dire questions.[1]

### NON–FINAL REPORT AND RECOMMENDATION

KING, United States Magistrate Judge.

Plaintiff Earl W. Rice filed this employment discrimination action against Defendant U.S.F. Holland, Inc. ("USF Holland"), on December 8, 2003. [Doc. 1]. Plaintiff Rice alleges that Defendant violated Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*, by discriminating against him on the basis of his religion. Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, Defendant has filed a motion for summary judgment [Doc. 33] on Plaintiff's claim based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted by the parties.

### I. Facts

When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party. *See Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir. 1984). Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true

for the limited purpose of evaluating Defendant's motion [Doc. 33] for summary judgment.

Defendant USF Holland is an over-the-road freight delivery company engaged in the pick up and delivery of commercial freight and is part of a highly competitive industry. [Defendant's Statement of Material Facts ("DSMF") ¶ 1]. Lewis Rogers, the terminal manager at USF Holland's location in Albany, Georgia, hired Plaintiff Earl W. Rice in June of 1998 for a driver/dockman position at the Albany terminal. [DSMF ¶ 2]. Plaintiff's job duties included delivering freight to and picking up freight from customers in Albany and surrounding Georgia cities, as well as performing dock duties (unloading and loading freight) as necessary. [DSMF ¶ 3].

Drivers deliver freight to customers in the morning and throughout the day. The dispatchers (one dispatcher works in the morning and one works in the afternoon) receive calls from customers who need freight picked up that day and assign those pickups to drivers via radio in the afternoon. [DSMF ¶ 4]. The Albany terminal is a relatively small terminal currently employing approximately nineteen (19) full-time local drivers/dockmen (in addition to managerial and administrative staff). The Albany terminal is a unionized facility that during the time that Plaintiff was employed operated in accordance with the terms of the National Master Freight Agreement ("Master Agreement") and Southern Pickup and Delivery Supplemental Agreement ("Local Agreement"), also collectively referred to as Collective Bargaining Agreement ("CBA"). [DSMF ¶ 5]. Plaintiff Rice testified that as a Union member, he had the right to file a grievance if the Company did not abide by the terms of the CBA. [Plaintiff's Deposition ("Pla.Dep.") at 96–97]. According to

---

1. Counsel shall provide a disc containing the voir dire questions.

Plaintiff, the Union and its members are "pretty protective of their seniority rights." [DSMF ¶ 8].

Pursuant to the terms of the Local Agreement, USF Holland utilizes a seniority system to facilitate the work-shift bidding process, which is based on drivers' hire dates. [DSMF ¶¶ 9, 10]. Plaintiff Rice's seniority date was June 22, 1998. [DSMF ¶ 9]. Job bids are posted one (1) week before the bid date, and the drivers bid for their desired shifts (which are numbered), proceeding in order from drivers of highest seniority to lowest, until all drivers have bid on a shift. [DSMF ¶ 12]. Jobs are awarded to the most senior employee who bids on the particular job. Thus, employees with the most seniority have first choice of jobs and shift assignments. [DSMF ¶ 13]. Completed job bids are posted on a bulletin board and maintained there until the bid is changed. [DSMF ¶ 14].

Lewis Rogers testified that, at the Albany terminal, he determines when to post a bid and what the shifts are and that these decisions are based on many factors including customer demands, business levels, the types of freight being handled, the times the customer pickups are available, and the distances and areas drivers travel. [Rogers Dep. at 90–94]. The terms of the Local Agreement of the CBA, however, provide that "[a]ll bids shall be posted and completed at least one (1) time in the month of April and one (1) time in the month of October" regardless of any other factors. [Rogers Dep. at 94; CBA Article 42, Section 5].

Sometime in 1998 or so, Plaintiff Rice notified Lewis Rogers that he was a Seventh-day Adventist and needed to be off on Saturdays to observe the Sabbath. [DSMF ¶ 16]. In approximately June of 2001, Plaintiff's then pastor, Mario Cruz, wrote his congregation a letter reiterating the importance of church members' observance of the Sabbath. [DSMF ¶ 17]. During the last two (2) weeks of August in 2001, Plaintiff became convinced that the Sabbath begins at sundown Friday. He acquired this belief while taking Bible studies at his church. [Pla. Dep. at 70, 114–15].

On August 30, 2001, the Albany terminal posted a new terminal bid and allowed drivers to begin bidding for shifts on September 3, 2001. [DSMF ¶ 18]. Plaintiff bid for and received a shift wherein he worked from 10:30 a.m. to 7:00 p.m., Monday through Friday.[1] [Pla. Dep. at 110]. At the time this bid became effective, on September 10, 2001, Plaintiff's work schedule did not conflict with his Sabbath because daylight savings time was still in effect and the sun set later than 7:00 p.m. [Doc. 36, Ex. I; Plaintiff's Statement of Material Facts ("PSMF") ¶ 8].

Plaintiff Rice testified that on September 7, 2001, he had a conversation with Rogers regarding his belief that the Sabbath began on Friday at sundown. [Pla. Dep. at 116–19]. Plaintiff testified:

> I began to tell him that I had a sincere conviction about worshipping the Sabbath a true way from sundown Friday to sundown Saturday.... I said I know bid sheets are supposed to be coming up in October. I said if you would you can put the unassigned down there so I can get the unassigned and that way you can bring me in early enough to be off on Fridays. I told him I would work Monday through Thursday any time he wants and I would take the less desirable position which is an unassigned to be able to be off on sundown Friday, that way he could call me in early on

---

1. At the time Plaintiff was terminated, Plaintiff ranked twelfth out of the sixteen (16) drivers on the Albany Terminal seniority list. [DSMF ¶ 21].

Friday so I could be off on time for the Sabbath. If not if he can make a Friday off available to me if it's possible by seniority then I would want that for accommodation.... I said I'm willing to take that first unassigned[2] that way I could be off for sundown Friday. I also told him that if there's any way possible that it would be appreciative [sic]. And then he assured me when I left he said he would handle it.

[Pla. Dep. at 118–19]. Rogers was asked and testified to the following:

Q. At the meeting when Earl Rice initially told you that he needed to be off work by sundown on Friday, did you offer Earl any accommodation at all? A. No, I did not because it's always been the practice in the Albany terminal—and to my knowledge, all the employees know—in fact, I'm sure Earl knew ... you could use your vacation time. You could work with your fellow employees. So no, I didn't offer that because the employee was already aware of what he could do.

[Rogers Dep. at 170].

Plaintiff testified that USF Holland allowed drivers to swap shifts on a particular day with other drivers and that this process was fairly easy. [Pla. Dep. at 111–12, 190–91]. During the September bid, there were four (4) available drivers with shifts who Plaintiff could have swapped with and, thus, satisfied his need to be off by dark on Fridays after daylight savings time ended on October 28, 2001. These four (4) drivers and their respective work schedules were: Joseph Rathel, 0400–1250, Monday through Friday; Mike Turner, 0500–1350, Monday through Friday; John Bentkowski, 0600–1450, Monday through Friday; Charles Clark, 0900–1750, Monday through Friday. [Pla. Dep. at 126–29, Ex. 8]. Plaintiff was aware that USF Holland allowed drivers to swap shifts and also knew who Rathel, Turner, Bentkowski, and Clark were, but Plaintiff never talked to these drivers or any other driver regarding swapping shifts. [DSMF ¶ 25].

There was no provision in the CBA in effect at the Albany terminal in 2001 that addressed the opportunity of drivers to engage in shift swaps. Rogers testified that he has not distributed a memorandum on the availability of shift swaps, post their availability on the bulletin board, or otherwise announced the availability of shift swaps to the Albany terminal drivers. [Rogers Dep. at 152–54]. Reggie Kinney, Director of Labor for the Southern Region for USF Holland during the relevant time,

2. Drivers on unassigned bids have no specific starting time or days to be worked, have to be available to work when and where needed, are sometimes called in as late as 2:00 p.m. to begin their eight (8) hour shift, may be required to work after sunset Fridays or even Saturdays, if needed, and are guaranteed forty (40) hours a week and eight (8) hour shifts. [DSMF ¶ 40]. Rogers stated in his declaration that the Albany terminal uses unassigned bids when it makes business sense to do so, but it is in USF Holland's best interest to use set bids, which are bids with specific times and days. [Rogers Declaration ("Dec.") ¶ 19]. Rogers testified:

[U]nassigned is not—is not the best thing to have ... because when you call somebody in on unassigned, you're guaranteeing them eight hours, number one. But the downside is if I have an unassigned, you can't work casual labor in ahead of unassigned labor. If you need somebody early in the morning to help strip trucks for four hours, if you call in the unassigned guy, you're locked into eight hours. So by not having unassigned people, you have ready access to casual labor with a dramatically different cost structure.... Unassigned [bids] ... give[ ] you a degree of flexibility of starting times. But it also limits your ability to use casual labor, which can drive up your costs. And you have to make that decision before you post these bids, what's the best for the company's operating situation. And that's what we do.

[Rogers Dep. at 101–02, 106].

testified that an occasional shift swap between drivers was permissible under the CBA. However, an arrangement reached between drivers where their shifts were swapped on a regular basis would constitute a violation of the CBA. [Kinney Dep. at 97–107]. Declarations made by a number of USF Holland employees and attached to Defendant's summary judgment motion indicate that drivers were allowed to "swap shifts with other drivers on unusual or special occasions" such as a "doctor's appointment" or an "emergency situation." [PSMF ¶ 21; Mills Dec. ¶ 5; K. Rogers Dec. ¶ 7; Turner Dec. ¶ 7; Bentkowski Dec. ¶ 6; Clark Dec. ¶ 6; Gravett Dec. ¶ 6; Green Dec. ¶ 5; James Dec. ¶ 5; Jordan Dec. ¶ 5; McLeod Dec. ¶ 6; Quaglietta Dec. ¶ 5; Rathel Dec. ¶ 10; Taft Dec. ¶ 5; White Dec. ¶ 6]. "Shift swapping is only done on a one time basis," and the "company does not allow [drivers] to switch shifts for a continuous or rotating schedule" or "for an extended period of time." [PSMF ¶ 21; Turner Dec. ¶ 7; Bentkowski Dec. ¶ 6; Clark Dec. ¶ 6; Green Dec. ¶ 5; James Dec. ¶ 5; Quaglietta Dec. ¶ 5; Taft Dec. ¶ 5].

Plaintiff never sought the Union's help regarding his desire to be off work by dark each Friday. [DSMF ¶ 26]. Although Plaintiff was aware that he was entitled to a combination of three (3) weeks vacation and sick time per year and was aware he could use this time to take off on Fridays, he did not do so. [DSMF ¶ 27]. USF Holland accommodated Plaintiff's desire to be off Fridays by dark on November 2, 2001, the first Friday after daylight savings time ended, by letting him go home early prior to the end of his shift. [DSMF ¶ 28].

On Friday, November 9, 2001, Plaintiff reported to work as usual, and at approximately 3:00 p.m., Plaintiff arrived to pick up a load at Georgia Ductile, located in Cordele, Georgia. [DSMF ¶ 29]. The cast iron materials at Georgia Ductile were loaded as they were being made; however, they were not ready to be loaded upon Plaintiff's arrival. [DSMF ¶ 30]. Plaintiff claims that Georgia Ductile advised him that the load would not be ready until after 4:00 p.m. [DSMF ¶ 31].

Plaintiff asserts that he contacted Matthew Bennett (the afternoon dispatcher) and told him that the load was not ready, and in the meantime, Plaintiff took his lunch between 3:00 p.m. and 3:30 p.m., while waiting at Georgia Ductile for the load to be ready. [DSMF ¶ 32]. Plaintiff testified that he phoned Bennett again at some point to let him know that the load at Georgia Ductile was not expected to be ready until about 4:30 p.m., and suggested to Bennett that he could go pick up freight from Harris Waste (another scheduled pickup that was fifteen (15) minutes away from Georgia Ductile) and return to Georgia Ductile thereafter. [DSMF ¶ 33]. Bennett told Plaintiff to wait at Georgia Ductile and that Bennett would tell Plaintiff when to pick up the load from Harris Waste. [DSMF ¶ 34]. Plaintiff waited at Georgia Ductile, and the freight there was completely loaded by 5:00 p.m. [DSMF ¶ 35].

Around 4:50 p.m., Plaintiff contacted Bennett, who instructed him to pick up the load at Harris Waste on his way back to the terminal. [DSMF ¶ 36]. Plaintiff testified: "I told Matt I would not have time to go by and pick up the freight and get back before dark. . . . He said Earl, you need to go pick that freight up and pick it up and come on in. I told him I would not have time to go pick it up and make it in before dark. He told me well, you know, your job will be at stake if you don't pick it up. I said well, I'll see you at the terminal." [Pla. Dep. at 164–65]. According to Rogers, there was "nobody else who could have possibly made the pickup . . . ." [Rog-

ers Dep. at 221]. USF Holland ultimately terminated Plaintiff's employment for refusing to pick up the load from Harris Waste. [DSMF ¶¶ 37, 38]. Plaintiff protested his discharge by filing a grievance through his Union, which was ultimately denied by a board comprised of two (2) union members and two (2) company members. [DSMF ¶ 39].

The September 2001 bid was designed to meet customer demands and USF Holland's needs. According to Rogers, rebidding to include unassigned bids at any time during September, October or November would have adversely affected USF's operations and would not have been a cost effective way of meeting USF's customer demands and business needs. [DSMF ¶ 43; Rogers Dec. ¶ 22]. If USF Holland posted an October bid with the exact same shifts as were in the September bid, due to Plaintiff's seniority, he would not have had the opportunity to bid on any earlier shift, and thus, this would not have helped him in his desire to be off of work by dark on Fridays. [DSMF ¶ 45]. Neither Plaintiff nor the Union filed a grievance when USF Holland did not post a bid in October, even though not posting an October bid apparently violated the Local Agreement of the CBA. [DSMF ¶ 46; Rogers Dep. at 94; CBA Article 42, Section 5].

Additional facts will be set forth below as they become necessary for discussion of Plaintiff's claims.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

The movant bears the initial burden of asserting the basis of its motion, and that burden is a light one. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The movant is not required to negate its opponent's claim. *See id.* Rather, the movant may discharge this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. When this burden is met, the non-moving party is then required to "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed. R.Civ.P. 56(e)).

While the evidence and factual inferences are to be viewed in a light most favorable to the non-moving party, *see Rollins*, 833 F.2d at 1529; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.1987), the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The non-moving party must come forward with specific facts showing there is a genuine issue for trial. *See id.* at 587, 106 S.Ct.

1348. An issue is not genuine if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511; *accord Young v. General Foods Corp.,* 840 F.2d 825, 828 (11th Cir.1988). Similarly, substantive law will identify which facts are material. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of every element essential to its case, so as to create a genuine issue for trial. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553; *Rollins,* 833 F.2d at 1528.

### III. Discussion

 Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff Rice contends that Defendant USF Holland violated Title VII by discriminating against him on the basis of his religion. A plaintiff "may utilize two theories in asserting religious discrimination claims: disparate treatment and failure to accommodate." *Hellinger v. Eckerd Corporation,* 67 F.Supp.2d 1359, 1362 (S.D.Fla.1999); *see also Tillery v. ATSI, Inc.,* 242 F.Supp.2d 1051, 1060 (N.D.Ala.2003) (same). In the present case, Plaintiff asserts a failure to accommodate claim. [Doc. 1]. To establish a *prima facie* case of failure to accommodate, a plaintiff must demonstrate that: (1) he had a *bona fide* religious belief that conflicted with an employment requirement; (2) he informed his employer about the belief and the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *See Beadle v. Hillsborough County Sheriff's Dept.,* 29 F.3d 589, 592 n. 5 (11th Cir.1994) (citing *Brener v. Diag-*

*nostic Center Hospital,* 671 F.2d 141, 144 (5th Cir.1982)); *Tillery,* 242 F.Supp.2d at 1060; *Hellinger,* 67 F.Supp.2d at 1362.

 Plaintiff Rice is able to establish a *prima facie* case. He is a Seventh-day Adventist who believes that secular work is prohibited from sunset Friday until sunset Saturday. [Pla. Dep. at 71–74, 114–15]. Plaintiff informed USF Holland about this belief when he met with Lewis Rogers on September 7, 2001, and he was fired from his position on Friday, November 9, 2001, after he refused to work past sunset. [Pla. Dep. at 115–16; 1st Adm. ¶¶ 9–14]. For purposes of summary judgment, Defendant USF Holland concedes that Plaintiff Rice is able to establish a *prima facie* case of failure to accommodate. [Doc. 33 at 16].

 Under Title VII, an employer has an obligation to "reasonably accommodate to an employee's … religious observance or practice," unless such accommodation would cause "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). *See also Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 63,107 S.Ct. 367, 369, 93 L.Ed.2d 305 (1986). "In formulating such an accommodation, both the employer and employee should remain flexible, with an eye toward achieving a mutually acceptable adjustment." *Cosme v. Henderson,* 287 F.3d 152, 158 (2nd Cir. 2002). However, "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia Bd. of Educ.,* 479 U.S. at 68, 107 S.Ct. at 372. Once the employer establishes that it offered any reasonable accommodation to the employee's religious need, the statutory inquiry ends. *Id.* The employer is neither required to offer its employee a number of accommodation options nor show that alternative accommodations proposed by the employee would result in an undue hardship. *Id.*

Both parties in the present case agree that because Plaintiff has established a *prima facie* case, the burden shifts to Defendant USF Holland to show that it either offered the plaintiff a reasonable accommodation or that any accommodation would have imposed an undue hardship on the company's business. [Doc. 33 at 16; Doc. 35 at 8]. Defendant contends that it offered Plaintiff Rice reasonable accommodations and that any alternative accommodations would have resulted in an undue hardship on the business operations of the company. [Doc. 33]. Because the "phrases 'reasonably accommodate' and 'undue hardship' are not defined within the language of Title VII, ... the precise reach of the employer's obligation to its employee is unclear under the statute and must be determined on a case-by-case basis." *Beadle*, 29 F.3d at 592. "To aid lower courts in their analysis of these cases, the Supreme Court has provided some guidance by generally defining 'undue hardship' as any act that would require an employer to bear greater than a '*de minimis* cost' in accommodating an employee's religious beliefs." *Beadle*, 29 F.3d at 592 (citing *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75, 97 S.Ct. 2264, 2272, 53 L.Ed.2d 113 (1977)).

Defendant USF Holland argues that "it offered three reasonable accommodations for Plaintiff's religious beliefs, and thus was not required to search for other accommodations or to consider alternate accommodations that were later proposed by Plaintiff." [Doc. 33 at 16]. It appears that the three (3) accommodations referred to by Defendant USF Holland and allegedly offered to Plaintiff Rice were: (1) swapping shifts with other employees; (2) taking vacation or sick leave; and (3) utilizing the seniority bid system contained in the CBA. [Doc. 33 at 18–20].

Plaintiff's schedule required him to work until 7:00 p.m. [Pla. Dep. at 110]. Because the sun set later than 7:00 p.m., while daylight savings time was still in effect, Plaintiff's work schedule did not interfere with his Sabbath until November. The work schedule-Sabbath conflict would have been present for approximately four (4) months until the beginning of daylight savings time. [Doc. 36, Ex. I; PSMF ¶ 8; Doc. 1, ¶ 16]. Defendant argues, "Plaintiff admits that USF Holland provided the options of swapping shifts with other employees and taking vacation and/or sick leave-both of which reasonably could have accommodated his desire to be off work by sundown on Fridays. Given that Plaintiff only needed an accommodation 'for less than four months,' either option provided Plaintiff the means for possibly avoiding the conflict between his job duties and his religious beliefs...." [Doc. 33 at 18].

The court finds this argument unpersuasive. There is no evidence that Defendant USF Holland "offered" to Plaintiff any accommodation at all. Defendant contends that all drivers, including Plaintiff, had the option to swap shifts with other drivers or take vacation or sick leave if they needed to modify their schedules periodically. [Doc. 38 at 2–3]. Defendant cites *Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113, and *Beadle*, 29 F.3d 589, in support of its contention that vacation or sick leave and the policy allowing shift swaps constituted offers of accommodation.

The problem with Defendant USF Holland's attempt to compare its "offer" of accommodation with the employers in *Hardison* and *Beadle* is that in those cases, the employer actually took some action in response to the employee's notification of the conflict between his work schedule and his Sabbath.[3] The employer

---

**3.** This is also true with respect to the other relevant cases the court has reviewed. *See,* e.g., *Cosme*, 287 F.3d 152; *Hudson v. Western Airlines, Inc.*, 851 F.2d 261 (9th Cir.1988).

either made efforts to resolve the plaintiff's conflict, or the employer offered the plaintiff information or advice on how, for example, a request for a change in his work schedule might be accommodated. In *Hardison,* the employer "held several meetings with plaintiff at which it attempted to find a solution to plaintiff's problems," "authorized the union steward to search for someone who would swap shifts," and "attempted without success to find Hardison another job." *Hardison,* 432 U.S. at 77, 97 S.Ct. at 2273. In *Beadle,* the employer informed the plaintiff "that he was free to arrange for shift swaps with the other employees" and provided him "with a roster sheet and authorized him to advertise his need for swaps during daily roll calls and on the [employer's] bulletin board." *Beadle,* 29 F.3d at 591. The employer "further allowed Beadle to request use of his sick days, vacation time and compensation time if he was unable to secure a swap." *Id.*

In this case, Defendant USF Holland made absolutely no effort to find a solution to Plaintiff Rice's conflict with his work schedule. Plaintiff testified that he informed Lewis Rogers on September 7, 2001, of his religious belief that he should not work after sundown on Fridays. [Pla. Dep. at 116–19]. The only response that Rogers made was to inform Plaintiff that "he would handle it." [*Id.*]. Rogers testified that he "didn't view" Plaintiff's notification of his conflict as a "matter of life and death." [Rogers Dep. at 219]. As a result, no decision maker at USF Holland made any effort to accommodate Plaintiff. Other than Rogers telling Plaintiff Rice on September 7, 2001, that he would take care of the problem, the only action taken by Defendant in response to the schedule conflict occurred on November 9, 2001, when the company fired Plaintiff. [DSMF ¶¶ 37, 38]. Given these facts, a reasonable jury could find that Plaintiff is able to prevail on his failure to accommodate claim. *See*

*EEOC v. Ithaca Industries, Inc.,* 849 F.2d 116, 118 (4th Cir.1988) (in finding that defendant subjected plaintiff to religious discrimination, the court noted the "absolute lack of effort at accommodation by the employer").

In its reply brief, Defendant USF Holland claims that Plaintiff failed to avail himself of available accommodations because he was aware of "shift swaps, vacations, and sick leave as options by which he could have modified his Friday schedule." [Doc. 38 at 3–4]. Defendant argues:

> Plaintiff faults the Company because it did not expressly call his attention to those non-permanent scheduling accommodations that were available to all employees.... Plaintiff fails to see the forest for the trees, arguing that his Title VII rights were violated simply because USF Holland did not, contemporaneous with his request for accommodation, discuss with him those options for accommodation of which he already was aware.

[Doc. 38 at 3]. The weakness in Defendant's argument is that not only did USF Holland make no effort to assist Plaintiff, but Rogers' verbal response was, in fact, worse for Plaintiff than if he had said nothing at all. Rogers was the terminal manager at the Albany location; he had authority to hire and fire employees; and he determined the times for posting bids and the various work shifts. [DSMF ¶ 2; Rogers Dep. at 90–94]. Given these facts, it seems clear that a reasonable person, upon hearing Rogers say that "he would handle" Plaintiff's problem, would presume that the problem would, in fact, be resolved and that no other action needed to be taken.

The court will assume *arguendo* at this point in the analysis that Defendant is correct in its contention that Plaintiff, for a short period of time, could have swapped shifts with other drivers or taken leave in

order to be off work by sundown on Fridays. [Doc. 33 at 18]. But this fact is irrelevant because Plaintiff had no reason to believe that swapping shifts with other drivers or taking leave was necessary. Oddly enough, a more "accommodating" response to Plaintiff's notification of the schedule-Sabbath conflict would have been for Rogers either to inform Plaintiff that the company was going to do nothing to help him or not respond in any way. Either of these would have put Plaintiff on notice that he needed to find a solution on his own. Instead, Rogers told Plaintiff Rice that he would resolve the conflict and did nothing. Plaintiff also notes that he was terminated on the first day that his work duties actually conflicted with his religious beliefs. [Pla. Dep. at 146–47]. Plaintiff was neither informed that he needed to use leave or swap shifts nor was he given the opportunity to utilize these options before he was fired.

Defendant USF Holland claims that Rogers told Plaintiff "that he would work with him when he could, and when Plaintiff failed to revisit the issue, Rogers naturally assumed that the proposed accommodation was acceptable." [Doc. 38 at 4]. Rogers testified: "I told [Plaintiff Rice] specifically, Earl, you know I can't just do a lot of those things.... [Y]ou are governed by the terms of the contract by which you are employed. And that I would try to work with you when I can, as I always have. And he said work with me when you can. And he turned around and walked out the door." [Rogers Dep. at 166]. Rogers' testimony about what was said during this meeting is very different from Plaintiff Rice's testimony. At trial, a jury may credit the testimony of Rogers and, thus, conclude that Plaintiff was aware that he needed to use leave, swap shifts, or take some other action in order to be off work by sunset on Fridays. But at summary judgment, the court is not permitted to discredit the testimony of the non-moving party, Plaintiff Rice, in favor of Rogers' testimony. Accordingly, the court finds that the Plaintiff reasonably believed that it was not necessary for him to take any action after hearing Rogers' response that "he would handle" Plaintiff's conflict.

Defendant USF Holland's next argument is that "the seniority system contained in the CBA also provided a reasonable accommodation for [Plaintiff Rice's] religious beliefs." [Doc. 33 at 19]. In support of this argument, Defendant cites *Hardison*, wherein the Supreme Court found that the collective bargaining agreement's seniority system "itself represented a significant accommodation to the needs, both religious and secular, of all of TWA's employees." *Hardison*, 432 U.S. at 78, 97 S.Ct. at 2274. The Court also noted that "the seniority system represents a neutral way of minimizing the number of occasions when an employee must work on a day that he would prefer to have off." *Id.* In the present case, Defendant USF Holland contends that the seniority bid system contained in the CBA constituted a reasonable accommodation of Plaintiff Rice's religious beliefs because it provided all employees with a neutral way of obtaining their desired shift preferences.[4] [Doc. 33 at 20].

4. Plaintiff incorrectly asserts that for the seniority system to constitute a reasonable accommodation, it must have been "a permanent solution to the conflict between Plaintiff's religious belief and his job." [Doc. 35 at 17–18]. Title VII only requires an employer to make "reasonable efforts to accommodate;" it does not require that the efforts result in a permanent or even successful solution to the employee's conflict. *Hardison*, 432 U.S. at 77, 97 S.Ct. at 2273. As the Supreme Court discussed in *Hardison*, the employer made numerous attempts to solve the plaintiff's scheduling problem and, thus, satisfied its burden under Title VII, even though these attempts were ultimately without success. *Id.*

The court finds this argument unpersuasive. In order to determine whether Defendant USF Holland provided Plaintiff with a reasonable accommodation, the court cannot simply look at the CBA's seniority system in isolation. All of Defendant's relevant actions must be considered. As noted *supra*, the Supreme Court in *Hardison* examined all of the employer's efforts to accommodate and determined that the company, unlike USF Holland, took many steps to accommodate the plaintiff's conflict. These included meeting with plaintiff, trying to find someone who would swap shifts with him, and attempting to find a different job for him. *Hardison*, 432 U.S. at 77, 97 S.Ct. at 2273.

If the existence of a neutral seniority system, in and of itself, established as a matter of law that an employer had provided its employees with a reasonable accommodation under Title VII, then courts would only need to determine if such a system was in place. No other analysis would be necessary. Yet, as noted *supra*, courts have not stopped after examining a company's system of assigning work shifts but have looked at all of the facts surrounding the system. The reason for this is clear: finding that a seniority system *ipso facto* constituted a reasonable effort to accommodate could allow employers to discriminate on the basis of religion but escape liability under Title VII.

An employer, for example, who regularly allowed employees to take leave or swap shifts when non-religious conflicts arose, could fire an employee immediately upon learning that his religious beliefs created a conflict with his work schedule. As long as the company's employees obtained their schedules via a neutral seniority system, the employer would not even be required to give the religious employee the opportunity to take leave or seek other arrangements but could simply terminate him on the spot. According to this line of argu-

ment, the employer would not need to make any effort to accommodate the employee's religious beliefs, even if an accommodation would cause no hardship whatsoever to the employer, because the seniority system itself would satisfy the accommodation requirement. This result is obviously incompatible with Title VII's requirement that employers "reasonably accommodate to an employee's ... religious observance or practice." 42 U.S.C. § 2000e(j). Because a neutral seniority system of assigning work shifts, in and of itself, is not sufficient to satisfy the reasonable accommodation requirement, the court finds that Defendant USF Holland did not make "reasonable efforts to accommodate" Plaintiff Rice. *Hardison*, 432 U.S. at 77, 97 S.Ct. at 2273.

■ As discussed *supra*, because Plaintiff Rice has established a *prima facie* case of failure to accommodate, Defendant USF Holland must show that it either offered Plaintiff a reasonable accommodation or that any accommodation would have imposed an undue hardship on the company's business. [Doc. 33 at 16; Doc. 35 at 8]. Defendant has failed to show that it offered Plaintiff Rice any reasonable accommodation. The next issue that must be addressed is whether any accommodation would have caused "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

Defendant argues that other alternative accommodations of Plaintiff's religious beliefs would have imposed more than a *de minimis* cost on USF Holland. [Doc. 33 at 21]. Defendant specifically discusses four (4) alternatives to the accommodations discussed *supra:* (1) re-bidding driver assignments in October 2001; (2) allowing Plaintiff to switch bids with other drivers; (3) allowing him to take an unassigned bid; and (4) allowing him to alter his Friday shift by starting or leaving ear-

ly or by taking his lunch at the end of his shift. [Doc. 33 at 21–22]. The court, however, does not need to address the alleged hardship that would have resulted from these alternative accommodations because swapping shifts and taking vacation or sick leave could have been offered by Defendant and clearly would not have imposed an undue hardship.

Plaintiff correctly argues that because Defendant admits that "shift swaps and the use of vacation/sick leave were reasonable accommodations that would not have been an undue hardship, it cannot now argue that any accommodation at all would have been an undue hardship, and the inquiry should end there."[5] [Doc. 35 at 20]. As discussed *supra*, the court has found that Defendant did not offer Plaintiff Rice any accommodation after he notified the company of the conflict between his Sabbath and his work schedule. Plaintiff testified that he informed Lewis Rogers on September 7, 2001, of his religious belief that he should not work after sundown on Fridays. [Pla. Dep. at 116–19]. The only response that Rogers made was to inform Plaintiff that "he would handle it." [*Id.*]. Had Rogers responded in almost any other way, Plaintiff would have been aware that he needed to swap shifts or use leave in order to be off work by sundown on Fridays. And as acknowledged by Defendant USF Holland, neither of these options would have imposed an "undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Defendant, therefore, has failed to rebut Plaintiff Rice's *prima facie* case of failure to accommodate.

## IV. Conclusion

For all the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant USF Holland's summary judgment motion [Doc. 33] be **DENIED** on Plaintiff's Title VII religious discrimination claim.

March 9, 2005.

---

5. Defendant quotes this sentence from Plaintiff's response in its reply brief, but Defendant does not address the argument made therein. [Doc. 38 at 6–7]. Instead, Defendant discusses how "Title VII does not require an employer to offer permanent or guaranteed religious accommodations when such accommodations would violate a CBA or constitute an undue hardship upon the employer." [*Id.*]. Defendant's statement is true, but it is not relevant to the company's acknowledgment that swapping shifts and using vacation or sick leave were reasonable accommodations that did not impose an undue hardship.